## COMMISSIONER OF INTERNAL REVENUE v. SCHUMACHER WALL BOARD CORPORATION.

### No. 8457.

Circuit Court of Appeals, Ninth Circuit.

Nov. 27, 1937.

James W. Morris, Asst. U. S. Atty. Gen., and Sewall Key, Norman D. Keller, Harry Marselli, and Milford Zimmerman, Sp. Assts. to the Atty. Gen., for petitioner.

Herman Phleger, Maurice E. Harrison, and Theodore R. Meyer, all of San Francisco, Cal. (Brobeck, Phleger & Harrison, of San Francisco, Cal., of counsel), for respondent.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This comes to us on a petition by the Commissioner of Internal Revenue, to review a decision of the Board of Tax Appeals determining bases of deficiency computations in respondent company's income taxes for the years 1929 and .1930.

The issue before the Board was concerned with the basis upon which to compute deductions taxpayer was entitled to by reason of loss, depreciation, and amortization of some of its assets; specifically the cost to the taxpayer of the assets upon which these deductions are claimed.

The taxpayer is a Delaware corporation organized in 1926. It acquired all its assets from a corporation of the same name, organized in 1924. Subsequent to the transfer of assets, the old corporation was dissolved. The question in the case is whether the cost basis of the acquired assets is their cost to the taxpayer, or their value to the transferor (the old corporation) under section 113(a) (7), Revenue Act of 1928 (26 U.S.C.A. § 113 note), which provides: "If the property was acquired after December 31, 1917, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 80 per centum or more remained in the same persons or any of them, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."

Section 114 of the same act (26 U.S.C.A. '§ 114 note)' states: "(a) *Basis for Depreciation*. The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the same as is provided in section 113 for the purpose of determining the gain or loss upon the sale or other disposition of such property."

The Commissioner claims that the basis of evaluating petitioner's assets should be the cost of these assets to the old corporation, the transferor, because immediately after the transfer an interest in these assets of more than 80 per cent. remained in the same persons who had held them before. The Board found that such an interest did not remain.

The facts of the acquisition of assets by the taxpayer as summarized by the Board, may be stated briefly as ·follows:

The entire common stock of the old corporation was owned by a group of persons known as the Schumacher individuals. Some of theses individuals also held certain patents relating to the manufacture of wallboard.

In June of 1926, the Schumacher individuals entered into a contract with Hunter, Dulin & Co. agreeing to transfer all their common stock and patents to Hunter, Dulin & Co., or to a corporation to be formed, in exchange for $1,546,300, a portion of which was to be withheld by Hunter, Dulin & Co. to retire the outstanding preferred stock of the old company. This contract was not conditional. Hunter, Dulin & Co. were obligated to purchase the stock without regard to its use in any reorganization of the company.

On July 6, 1926, Hunter, Dulin & Co. caused the taxpayer (the new company) to be incorporated under the laws of Delaware. Authorized capital stock, 30,000 preferred and 60,000 common, all without par value. The taxpayer was organized for the purpose of taking over all the assets and good will of the old company and the patents owned by the Schumacher individuals.

On August 16, Hunter, Dulin & Co. sent escrow instructions to a Los Angeles .bank that within 48 hours it would send the bank voting trust certificates representing 59,990 shares of taxpayer's common stock and 18,750 preferred. The bank was directed to issue voting trust certificates for the preferred 49,000 of the common to three other companies against cash payments aggregating $1,190,334.

On August 17, Hunter, Dulin & Co. caused the assets to be transferred from the old company to the new practically simultaneously with the acquisition of the stock from the Schumacher individuals for a cash payment.,

The new company issued its 30,000 preferred and 59,990 common to the old company in. exchange for the latter's assets and the latter's procuring the assignment of the patents to the new company. The old company assigned all the stock of the new company to Hunter, Dulin & Co. in exchange for a promissory note and Hunter, Dulin & Co.'s assigning the patents to the new company. This was followed immediately by the dissolution of the old company, Hunter, Dulin & Co. acquiring in the dissolution the promissory note it had given the old company. Hunter,

Dulin & Co. then placed all the taxpayer's common stock (59,990) in a voting trust, and certificates representing 49,075 shares were issued to three ultimate transferees, Schwabacher & Co.; Cass, Howard & Sanford, and the Paraffine Companies. None of these concerns had had any interest in the assets before the transfer of assets from the old corporation to the new.

The Board of Tax Appeals found that the transfer of the majority interest in the common stock from Hunter, Dulin & Co. to the three ultimate transferees was a step in an integrated prearranged series of transactions which contemplated that Hunter, Dulin & Co. was no more than an instrument by which a controlling interest in the assets passed to stockholders who had held no interest before. It found that Hunter, Dulin & Co. "on the same day that it acquired the stock of the petitioner, and as a part of the general plan * * * sold the majority * * * to three other concerns for cash."

In the light of uncontradicted evidence in the record, showing that Hunter, Dulin & Co. was, previous to the transfer of assets, bound by contract to convey to the three ultimate transferees the bulk of the taxpayer's common stock received from the old company, we interpret this finding of "the general plan" to include this contractual obligation.

Reduced to its essentials, the situation discloses that Hunter, Dulin & Co., for some time previous to the transfer of assets to the taxpayer, was bound by contract to take over from the Schumacher individuals the entire common stock of the transferor corporation; that it actually acquired such stock and thus had more than an 80 per cent. controlling interest before the transferor corporation conveyed its assets to the taxpayer; that immediately after the transfer of assets, Hunter, Dulin & Co., pursuant to contract with the transferor corporation, received stock of the taxpayer in excess of 80 per cent. controlling interest; that at the instant of receiving this new stock, Hunter, Dulin & Co. was bound by contract to convey the greater part of it to the three ultimate transferees; and that, in pursuance of this obligation, it did so transfer the new stock.

On these facts the Commissioner urges that the instant before and the instant after the transfer of assets from the old corporation to the taxpayer, an interest of 80 per cent. or more remained in the same person or persons, namely, Hunter, Dulin & Co., and that hence the basis of gain, loss, and depreciation under the statute, is the same as it would have been in the hands of the old corporation.

Conceding, as it must, this momentary continuation of an interest of over 80 per cent. in Hunter, Dulin & Co., the taxpayer argues that due to the series of contractual obligations by which Hunter, Dulin & Co. had previously bound itself, first, to acquire the stock of the old company, then to accept the stock of the new, and, lastly, to transfer the majority of the new stock to three other concerns, the series of transactions must be viewed as a unit, and the ownerships of 80 per cent. interest compared at the beginning and end of the consummation of the entire plan. In this view of the case, Hunter, Dulin & Co. did not retain sufficient control to bring the situation within the statute.

The Board adopted the taxpayer's contention, holding that "the question of control is to be determined by the situation existing at the time of the completion of the plan rather than at the time of the fulfillment of one of the intermediate steps."

We agree with the holding of the Board. The statute is obviously intended to reach those cases where unfettered substantial control of a corporation survives a reorganization, regardless of subsequent disposition of that control. We do not believe it was intended to apply to a situation where there is a binding contract simultaneously performed, by which the stock merely passes through intermediate holders to those to whom the contract compels immediate delivery.

The principle controlling the decision in this case is stated by the Supreme Court to be: "We recognize the importance of regarding matters of substance and disregarding forms in applying the provisions of the Sixteenth Amendment and income tax laws enacted thereunder. In a number of cases besides those just cited we have under varying conditions followed the rule. Lynch v. Turrish, 247 U.S. 221, 38 S.Ct. 537, 62 L.Ed. 1087; Southern Pacific Co. v. Lowe, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142; Gulf Oil Corporation v. Lewellyn, 248 U.S. 71, 39 S.Ct. 35, 63 L.Ed. 133."

U. S. v. Phellis, 257 U.S. 156, 168, 42 S.Ct. 63, 65, 66 L.Ed. 180.

It is squarely within our decision in Halliburton v. Commissioner (C.C.A.9) 78 F.2d 265, 267, where we relied on the principle in the Phellis Case. The two taxpayers in that case were sole members of a partnership engaging in oil well cementing. Taxpayers entered into a contract with seven oil companies, which contract provided for the formation of a new corporation to take over the assets and business of the partnership. The new corporation was to have an authorized capital stock of 3,500 shares, of which the taxpayers were to have 1,780 and the oil companies 1,300. When the assets of the partnership were transferred to the new corporation, the taxpayers received their 1,780 shares. It was not until 22 days later that the remaining 1,300 shares were issued to the oil companies, as provided in the contract. Therefore, during the interim, the taxpayers held the entire outstanding stock of the corporation. We held that notwithstanding this ownership, the pre-existing contractual arrangement negatived the proposition that an 80 per cent. interest or control remained in the transferor taxpayers.

Equally conclusive of the present appeal are Hazeltine Corporation v. Commissioner (C.C.A.3) 89 F.2d 513, 518, Bassick v. Commissioner (C.C.A.2) 85 F.2d 8, 10, certiorari denied 299 U.S. 592, 57 S.Ct. 120, 81 L.Ed. 436, and Von's Inv. Co. v. Com'r (C.C.A.9) 92 F.2d 861 (Nov. 24, 1937).

We hold, therefore, that the basis for determining depreciation of the taxpayer's assets was the cost of these assets to the taxpayer. The Board found this cost to be $1,800,000, which was the value of the stock issued in exchange for the assets.

The Commissioner assigns error to this finding of value. He does not quarrel with the determination of the value of the stock; but he claims that what was paid for the assets is not to be determined by the value of stock given for them, but rather by the money paid to the Schumacher individuals by Hunter, Dulin & Co.; in other words, $1,546,300.

The Commissioner is in error. The cost of an article to a person is what the person pays for the same. The Commissioner asserts that if all these sales and transfers were part and parcel of the same general transaction, then whatever the Schumacher individuals, stockholders of the old corporation, received for the as-

sets should be the cost of the assets to the new corporation. The argument is specious. Whether there was one transaction or many, the new corporation taxpayer paid a definite amount for its assets. The amount it paid is obviously the cost to it of those assets. The fact that some of the quid pro quo went to promotor Hunter, Dulin & Co., instead of to former owners of the assets, has nothing to do with what the assets cost the taxpayer.

The decision is affirmed.