**COMMISSIONER OF INTERNAL REV-
ENUE, Petitioner,**

v.

**Oscar E. BAAN and Evelyn K. Baan,
Respondents.**

**No. 20863.**

United States Court of Appeals
Ninth Circuit.

July 7, 1967.

Rehearing Denied Sept. 15, 1967.

Richard M. Roberts, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., Lester R. Uretz, Chief Counsel, I. R. S., Washington, D. C., for petitioner.

Harry R. Horrow, Stephen J. Martin, Pillsbury, Madison & Sutro, San Francisco, Cal., for respondents.

Before HAMLEY, MERRILL and ELY, Circuit Judges.

HAMLEY, Circuit Judge:

The Commissioner of Internal Revenue (Commissioner) determined a deficiency in the 1961 income tax of Oscar E. and Evelyn K. Baan, in the amount of $284.-

44. Taxpayers petitioned the Tax Court for a redetermination of the Commissioner's finding. The Tax Court decided there was no deficiency, its opinion being reported at 45 T.C. 71. The Commissioner petitioned this court to review that decision.

During 1961, taxpayers owned six hundred shares of Pacific Telephone and Telegraph Company (Pacific) common stock. In that year they received six hundred stock rights, represented by transferable stock purchase warrants issued by Pacific, entitling them to purchase one share of Pacific Northwest Bell Telephone Company (Northwest) common stock for sixteen dollars and six stock rights.

On October 11, 1961, taxpayers exercised their stock rights and, in consideration for $1,600 ($16 per share) and the surrender of the six hundred stock rights, received one hundred shares of Northwest stock. The fair market value of Northwest common stock on October 11, 1961, was $26.94 per share.

In their joint federal income tax return for that year, taxpayers did not include as income any amount with respect to the issuance of the six hundred rights to purchase Northwest stock, or any amount with respect to the purchase by them of one hundred shares of Northwest stock upon the surrender of the six hundred rights and the payment of $1,-600. The Commissioner determined that the difference between the fair market value of the Northwest stock received and the sixteen dollars per share paid constituted a taxable dividend.

In the redetermination proceedings the Tax Court rejected the Commissioner's contention. The issue has been renewed in this review proceeding. The essential facts are not in dispute and the following statement of those facts is taken, almost verbatim, from the Commissioner's opening brief.[1]

Prior to July 1, 1961, Pacific, a California corporation, furnished communi-

1. A more complete statement is set out in the Tax Court's reported statement of facts and opinion, at 45 T.C. 71.

cation services in California, Oregon, Washington and part of Idaho. Beginning in 1960, the California and non-California businesses of Pacific were operated by separate divisions. For a number of business reasons, the management and shareholders of Pacific decided early in 1961 that the non-California business should be handled by a separate corporation. Accordingly, on March 27, 1961, Pacific caused the organization of Northwest, a Washington corporation. The following day ten thousand shares of Northwest common stock were issued to Pacific upon the payment by Pacific to Northwest of $110,000 in cash.

As of June 30, 1961, all of the business and properties of Pacific in Oregon, Washington and Idaho were transferred to Northwest in exchange for (1) the issuance to Pacific by Northwest of an additional 30,450,000 shares of its common stock, (2) the issuance to Pacific by Northwest of an interest-bearing demand note in the amount of $200,000,000, and (3) assumption by Northwest of certain liabilities of Pacific in Oregon, Washington and Idaho. At the close of business on June 30, 1961, Pacific ceased all operations in Oregon, Washington and Idaho, and Northwest commenced operations in these states on the next day.

An integral part of the plan for dividing the businesses of Pacific was the sale of Northwest stock to Pacific shareholders or their assigns. Assignable stock rights were to be issued to Pacific shareholders which would enable them either to purchase Northwest stock upon surrender of the rights plus the payment of cash in an amount to be set by Pacific's board of directors, or to sell the rights to others who could so exercise them. The purpose of the plan to require a cash payment in addition to the surrender of the stock rights was to provide Pacific with funds for its future operations in California.

On August 25, 1961, Pacific's board of directors decided that the offering price of Northwest stock to Pacific shareholders, or to those who had purchased the stock rights from shareholders, should be sixteen dollars per share. Pacific shareholders were to receive one transferable stock purchase warrant for each share of Pacific held, with six rights plus the payment of sixteen dollars required to obtain one share of Northwest stock. Between the time of the issuance of the rights (September 20, 1961) and the deadline for their exercise (October 20, 1961), the fair market value of Northwest stock was no less than twenty-six dollars per share.

The Northwest stock disposed of by Pacific in the above-described 1961 offering amounted to approximately fifty-seven percent of the total number of Northwest shares held by Pacific.[2] It had been planned by Pacific from the outset that the remainder would be held for disposition at a later time to be determined by Pacific's board of directors. The remaining forty-three percent of Northwest stock held by Pacific was offered to Pacific's shareholders on June 12, 1963, at the same price of sixteen dollars per share, the principal differ-

---

2. American Telephone and Telegraph Company (American), owned approximately ninety percent of Pacific's common stock. The bulk of the total of 17,446,031 shares of Northwest sold by Pacific in 1961, namely 15,548,140 shares, was thus acquired by American. The minority shareholders of Pacific, or their assignees, acquired the remaining 1,897,891 shares of Northwest. For the Northwest stock it sold in 1961, Pacific received cash in the total amount of $279,136,496.

On the consolidated income tax return filed by American and its subsidiaries for the year 1961 (which return included Pa-

cific) no gain or loss was reported on the transaction in which Pacific transferred its non-California assets to Northwest. Similarly, since it was not required to report gains or losses in certain inter-company transactions, no gain was reported on the 1961 consolidated return on the sale of 15,548,140 shares of Northwest common by Pacific to American. Gain was reported by Pacific, however, in the amount of $8,739,362.07, with respect to the 1,897,891 shares of Northwest sold by Pacific to its minority shareholders or their assignees in 1961.

ence being that eight stock rights, instead of six, were required.[3]

As of December 31, 1960, Pacific had unappropriated earned surplus in the amount of $192,053,880.76. As of December 31, 1961, Pacific had $178,935,-190.15 of unappropriated earned surplus. There was a sufficient dollar amount of earnings and profits of Pacific in 1961 from which a 1961 dividend could have been paid by Pacific to its shareholders to cover the dollar amounts which the Commissioner contended in this case were received by taxpayers and other shareholders as dividend income.[4]

On these facts, the Tax Court decided that the transaction whereby Pacific sold its non-California business to Northwest and then sold the Northwest stock to its own shareholders or their assignees, qualified as a tax-free spin-off within the terms and intendment of section 355 of the Internal Revenue Code of 1954, 26 U.S.C. § 355 (1964).[5] Consequently, the Tax Court ruled that the taxpayers were not taxable on the gain realized by them when they exercised their rights to acquire Northwest stock having a fair market value of $26.94 per share at a cost to them of sixteen dollars per share.

As the Tax Court stated in its opinion, there is no serious question that, apart from certain specific provisions of the 1954 Code, the exercise of rights by Pacific's stockholders in the circumstances of this case would result in classifying, as taxable dividends, the excess of the value of the Northwest stock over the subscription price. As indicated above, section 355 was primarily relied upon by taxpayers in seeking, and the Tax Court in granting, non-recognition of the gain realized by taxpayers as a result of their exercise of the rights in question.

The Commissioner argues, however, that four specific requirements of section 355 remain unsatisfied in this case and it was therefore error to grant, on the basis of that statutory provision, non-recognition to this otherwise taxable gain. Section 355 is quoted in the margin.[6] Before discussing these asserted

---

3. As a result of the June 12, 1963 offering of the remainder of Northwest stock, American acquired an additional 11,597,-417 shares of Northwest, and the minority shareholders of Pacific acquired the remaining 1,416,552 shares of Northwest.

4. In response to requests by Pacific, the Commissioner issued a ruling letter on June 28, 1961, regarding the tax consequences of the planned division of Pacific and the distribution of Northwest stock through an issue of assignable rights and the payment of cash. Essentially, the Commissioner ruled that, in the case of Pacific's shareholders who sold their rights, the full amount realized would be ordinary income to them and that, in the case of individual Pacific shareholders who exercised their rights, the difference between the fair market value of Northwest stock (on the date the rights were exercised) and the sixteen dollars per share price paid would be taxed to such shareholders as dividend income. On November 15, 1962, the Commissioner issued another ruling letter to Pacific which reaffirmed the position taken in the ruling of June 28, 1961.

5. Section references, throughout this opinion will be to the Internal Revenue Code

of 1954, unless otherwise expressly stated.

6. Section 355 reads as follows:
 "§ 355. **Distribution of stock and securities of a controlled corporation.**
 "(a) **Effect on distributees.—**
 "(1) **General rule.**
 "If—
 "(A) a corporation (referred to in this section as the 'distributing corporation')—
 "(i) distributes to a shareholder, with respect to its stock, or
 "(ii) distributes to a security holder, in exchange for its securities,
 solely stock or securities of a corporation (referred to in this section as 'controlled corporation') which it controls immediately before the distribution,
 "(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated

requirements of section 355, and the question of whether they were here satisfied, it will be helpful to review briefly the legislative history of that section.

or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

"(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

"(D) as part of the distribution, the distributing corporation distributes—

"(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

"(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

"(2) Non pro rata distributions, etc.

"Paragraph (1) shall be applied without regard to the following:

"(A) whether or not the distribution is pro rata with respect to all of the shareholders of the distributing corporation,

"(B) whether or not the shareholder surrenders stock in the distributing corporation, and

"(C) whether or not the distribution is in pursuance of a plan of reorganization (within the meaning of section 368 (a)(1)(D)).

"(3) Limitation.

"Paragraph (1) shall not apply if—

"(A) the principal amount of the securities in the controlled corporation which are received exceeds the principal amount of the securities which are surrendered in connection with such distribution, or

"(B) securities in the controlled corporation are received and no securities are surrendered in connection with such distribution.

"For purposes of this section (other than paragraph (1)(D) of this subsection) and so much of section 356 as relates to this section, stock of a controlled corporation acquired by the distributing corporation by reason of any transaction which occurs within 5 years of the distribution of such stock and in which gain or loss was recognized in whole or in part, shall not be treated as stock of such controlled corporation, but as other property.

"(4) Cross reference.

"For treatment of the distribution if any property is received which is not permitted to be received under this subsection (including an excess principal amount of securities received over securities surrendered), see section 356.

"(b) Requirements as to active business.

"(1) In general.

"Subsection (a) shall apply only if either—

"(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

"(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business.

"(2) Definition.

"For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

"(A) it is engaged in the active conduct of a trade or business or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

"(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of such distribution,

"(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

"(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

"(i) was not acquired directly or through one or more corporations) by another corporation within the period described in subparagraph (B), or

"(ii) was so acquired by another corporation within such period, but

A spin-off occurs where a part of the assets of a corporation is transferred to a new corporation and the stock of the transferee is distributed to the shareholders of the transferor without the surrender by them of stock in the transferor. See 3 Mertens, Law of Federal Income Taxation (Zimet and Weiss Revision) § 20.100, page 491. Congress apparently first permitted the tax-free treatment of spin-off transactions in section 203(c) of the Revenue Act of 1924, ch. 234, 43 Stat. 256 (1924). Because of the general terms of that and subsequent enactments,[7] Congress soon recognized that wide-spread tax avoidance might result.[8]

Congress reacted to this possibility by eliminating the provision which characterized the spin-off as a non-taxable reorganization. See the Revenue Act of 1934, ch. 277, 48 Stat. 680, 704 (1934). From then until 1951, without regard to whether a particular transaction served a legitimate business need, the gain realized by a shareholder as a result of a spin-off was subject to tax as an ordinary dividend.

In 1951, Congress reconsidered its position, having come to the view that business reasons could exist which would justify allowing tax-free status to the division of a single corporation into two or more corporations each owned directly by the shareholders. Therefore, in that year, Congress reinstated non-recognition treatment to those spin-offs which met carefully specified conditions. In so doing Congress additionally provided that ordinary dividend treatment would still be accorded the transaction, even if it would otherwise qualify under the new spin-off provisions, if the transaction was principally used as a "device" for distributing earnings and profits to the shareholders of any corporation that was a party to the reorganization. See section 112(b) (11) of the Internal Revenue Code of 1939, added by section 317 of the Revenue Act of 1951, ch. 521, 65 Stat. 493 (1951).

In the Internal Revenue Code of 1954, Congress sought to create a single set of limitations that would govern all forms of transactions having the potential of either a bona fide business transaction or a tax avoidance scheme. Under the 1954 Code, which is applicable in this case, such transactions, including not only spin-offs, but also so-called split-offs and split-ups, are to be tested under the provisions of section 355.[9] In addition to further circumscribing the basic prerequisite for non-recognition, section 355 also carried over the "device" restriction that was part of the 1951 legislation. See 3 Mertens, Law of Federal Income

---

such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period."

7. Other similar enactments followed the 1924 statute: Revenue Act of 1926, ch. 27, § 203(c), 44 Stat. 13 (1926); Revenue Act of 1928, ch. 852, § 112(g), 45 Stat. 818 (1928); Revenue Act of 1932, ch. 209, § 112(g), 47 Stat. 197 (1932).

8. At least arguably, the 1924 statute would have permitted the transfer of liquid assets to a new corporation. The new corporation's shareholders would then be in a position to liquidate the new corporation and so receive the liquid assets as a liquidating distribution taxable at capital gains rates. Such a transaction was actually litigated in Gregory v. Helvering, 293 U. S. 465, 55 S.Ct. 266, 79 L.Ed. 596. See 3 Mertens, Law of Federal Income Taxation (Zimet and Weiss Revision) §§ 20.55, 20.101, pages 193–203, 496–498.

9. A split-off involves the same kind of transaction as a spin-off except that the shareholders surrender part of their stock in the parent corporation in exchange for stock in the subsidiary. In a split-up, the parent corporation transfers substantially all its assets to two or more corporations and then liquidates, its stockholders surrendering all their stock in the transferor and receiving the stock in the transferee corporations. See Note, Tax Treatment of Corporate Divisions, 52 Colum.L.Rev. 408, 409 (1952); Mintz, Divisive Corporate Reorganizations: Split-Ups and Split-Offs, 6 Tax L.Rev., 365 (1951).

Taxation (Zimet and Weiss Revision) § 20.101, pages 494–503.

The Commissioner argues that, in the four following respects, each of which is indispensable, the transaction here in question failed to satisfy essential requirements of section 355:

(1) Pacific did not "distribute" solely stock or securities to taxpayers "with respect to its stock," as assertedly required by section 355(a) (1) (A).

(2) Since Pacific did not distribute "control" of Northwest without consideration, it did not meet the asserted requirements of section 355(a) (1) (D).

(3) Pacific did not distribute control of Northwest in a single distribution, as assertedly required by section 355(a) (1) (D).

(4) Contrary to the requirement of section 355(b) (2) (C), Northwest acquired its telephone business from Pacific in a transaction in which gain was "recognized."

We will first consider, together, the first two of these contentions. Both of them are generally directed to the section 355(a) (1) (A) provision that nonrecognition of gain will be granted only if the distributing corporation (Pacific) distributes to a shareholder (taxpayers), "with respect to its stock" (with respect to taxpayers' ownership of Pacific's stock), "solely stock or securities" of a controlled corporation (Northwest) which the distributing corporation controls immediately before the distribution.

Beyond question, Pacific distributed stock rights to taxpayers with respect to their ownership of Pacific stock. This is shown by the fact that taxpayers received one stock right for each share of Pacific which they owned, without being required to give any consideration to Pacific.

 This is not the kind of distribution, however, which is exempted from taxation under section 355(a) (1) (A). That statutory provision relates "solely" to the distribution of "stock or securities" of the controlled corporation.[10] Further, in view of section 355 (a) (1) (D) (ii), which incorporates the "control" definition of section 368(c), the "stock or securities" distributed must carry voting rights. Stock rights are not stocks or securities and, most assuredly, are not stocks or securities carrying voting rights. They are only options to purchase stock. See Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 200–201, 62 S.Ct. 546, 86 L.Ed. 789.

It follows that section 355 does not here afford a basis for non-recognition of gain or loss unless the manner in which Northwest stock, as distinguished from the voting rights, was transferred from Pacific to taxpayers, constituted a "distribution" to them with respect to their ownership of Pacific's stock, within the meaning of that section.

 For present purposes we may assume that intercession of a stock rights scheme would not, standing alone, prevent a transfer of Northwest stock from Pacific to taxpayers from constituting a distribution with respect to taxpayers' ownership of Pacific's stock. But this stock rights scheme did not stand alone. In addition to surrendering six stock rights, taxpayers were also required to pay sixteen dollars for each share of Northwest stock acquired. The transaction then became a sale of corporate assets.

Although the Supreme Court said in Palmer v. Commissioner of Internal Revenue, 302 U.S. 63, 69, 58 S.Ct. 67, 82 L.Ed. 50, that a sale of corporate assets to stockholders is, in a literal sense,

---

10. The following statement appears in section 1.355–1(a) of the Treasury Regulations on Income Tax (1954 Code) : "For the purpose of section 355, stock rights or stock warrants are not included in the term 'stock or securities.'" For a detailed discussion of the term "stock or securities," see 3 Mertens, Law of Federal Income Taxation (Zimet and Weiss Revision) § 20.67, pages 285–286. But see Note, 35 U.Cinc.L.Rev. 254, 256 (1966).

a "distribution" of its property, we do not believe that it is the kind of distribution contemplated by section 355. Instead of being simply a distribution with reference to taxpayers' ownership of Pacific's stock it is a distribution with reference to that ownership *plus* the payment of sixteen dollars a share.

As the Commissioner correctly states in his argument to this court, whatever meaning may be attached to the word "distribute," standing by itself or in a different context, the phrase "distributes * * * with respect to * * * stock" is a term of art with a consistent meaning throughout the Code. It is used only to refer to distributions without consideration, not to sales for a cash consideration.[11]

Contrary to taxpayers' contention, there is no contradiction between a view which interprets only distributions without consideration as being within the section 355 phrase, "distributes * * * with respect to * * * stock," and the Commissioner's determination that taxpayers received a distribution from Pacific which is taxable as a dividend under section 301 of the Code, 26 U.S.C. § 301 (1964). It is true that both sections refer to a distribution made by a corporation to a shareholder " * * *

with respect to its stock. * * *" However, section 355 relates this provision to the distribution of "solely stock or securities of a corporation * * *," whereas section 301 relates this provision to the distribution of "property (as defined in section 317(a))."

Section 317(a), 26 U.S.C. § 317 (1964), makes it clear that "property" is not limited to stock or securities but may include "any other property." Thus Pacific's distribution of stock rights "with respect to its stock" logically constitutes the distribution of property within the meaning of section 301, but, for the reasons stated above, does not constitute the distribution of "stock or securities" within the meaning of section 355.[12]

The dividend ruling by the Commissioner was with respect to the distribution of assignable stock rights to Pacific shareholders. It is true, as the Supreme Court said in Palmer v. Commissioner of Internal Revenue, 302 U.S. 63, 71, 58 S.Ct. 67, 82 L.Ed. 50, that the mere issue of rights to subscribe and their receipt by shareholders is not a dividend. But where, as in our case, this is coupled with the fact that, at the time of the distribution of stock rights, there is a "spread" between the fair market value of the stock and the pur-

---

11. See section 301 (distributions of property), section 305 (distributions of stock and stock rights), section 307 (basis of stock and stock rights acquired in distributions), section 311 (taxability of corporations on distributions), and section 312 (effect of a distribution on corporate earnings and profits).

12. Taxpayers point to sections 1.301–1(j) and (k) of the Treasury Regulations on Income Tax (1954 Code) as contradicting the Commissioner's contention that, throughout the 1954 Code, the phrase "distribution * * * to a shareholder with respect to its stock" never means distribution for a *cash* consideration.

 Income Tax Regulation 1.301–1(j) does not pertain to distributions to a shareholder "with respect to its stock," but to the "transfer" of property by a corporation to a shareholder for an amount less than its fair market value in a sale or exchange. With respect to such transaction, this regulation provides that such

shareholder shall be "treated" as having received a distribution to which section 301 applies. The plain meaning of this regulation is to bring within the provisions of section 301, certain transactions which are not strictly distributions of property by a corporation "with respect to its stock."

 Income Tax Regulation 1.301–1(k) demonstrates how (j) is to be applied, by giving as an example, a purchase by a shareholder, from his corporation, for twenty dollars, property having a fair market value of one hundred dollars. The rule indicates that under these circumstances the amount of the distribution determined under section 301(b) is eighty dollars. This example demonstrates that Regulation 1.301–1(j) does not deal with distributions of corporate property "with respect to its stock," but to other kinds of corporate transfers to shareholders which will nevertheless be treated as if they were stock distributions.

chase price as called for by the stock rights, an intention to declare a dividend is indicated. The amount of the dividend, determinable at the time the shareholder of the distributing corporation exercises his stock rights, is the lower of the "spread" on the date of issue or the "spread" on the date of exercise. See Choate v. Commissioner, 2 Cir., 129 F.2d 684, 687. Cf. Commissioner v. LoBue, 351 U.S. 243, 249, 76 S.Ct. 800, 100 L.Ed. 1142.[13]

■ Taxpayers call attention to the fact that, in view of section 355(a) (2) (B), there may be a section 355(a) (1) (A) (i) distribution to a shareholder "with respect to its stock," even though the plan calls for the shareholder to surrender stock in the distributing corporation.[14] Likening such a surrender of stock by a shareholder to the payment of consideration for stock being distributed to a shareholder, taxpayers argue that a distribution of stock of a controlled corporation under a plan which calls for a cash payment by the distributing corporation's shareholders, is likewise a distribution "with respect to its stock."

If, as part of a plan to distribute to its shareholders the stock of a controlled corporation, the distributing corporation requires that recipient shareholders surrender stock in the *distributing* corpora-

tion, it is patently a distribution to the shareholder "with respect to its stock," just as much as if no surrender of such stock were required. No factor unassociated with the shareholder's ownership of the distributing corporation's stock has been introduced. But where the plan requires a cash payment by a recipient shareholder, a new element, unassociated with a shareholder's ownership of the distributing corporation's stock, has been interjected.

■ As we view it, the impact of the section 355(a) (2) (B) provision to which taxpayers call attention, as related to our problem, runs against, instead of in favor of, taxpayers' position. Congress made clear in this section that a surrender of stock in the distributing corporation would not defeat a section 355(a) (1) transaction, but it made no such exception in the case of plans calling for cash payments from recipient shareholders.[15]

Taxpayers argue that sections 354 and 356 of the Code, 26 U.S.C. §§ 354 and 356 (1964), support their view that section 355 does not preclude the payment of cash by a tax-free distributee. We do not agree. Neither section 354 nor section 356 pertains to a distribution by a corporation "with respect to its stock," which is an express limitation in a sec-

---

13. In our case, the value of the Northwest stock on the date of exercise of the rights by the taxpayers did not exceed the value of that stock on the date of issuance of the rights.

14. The provision of section 355(a) (2) (B), to the effect that section 355(a) (1) shall be applied without regard to whether or not the shareholder surrenders stock in the distributing corporation, was designed to make section 355(a) (1) applicable to "split-offs" and "split-ups," as well as "spin-offs." Mertens, Law of Federal Income Taxation, Code Commentary, § 355 (a) :3, page 219.

15. Taxpayers also direct our attention to the fact that the term "distributes" as used in (ii) of section 355(a) (1) (A) clearly refers to transfers by a corporation for a consideration, namely exchanges by a distributing corporation of stock or securities of the controlled corporation for

its own "securities." Taxpayers argue that the surrender of "securities" under this provision is one form of consideration, thereby indicating that the term "distributes * * * with respect to * * * stock," as used in (i) of section 355(a) (1) (A) was intended to be used in its broadest sense, and could include distributions involving a payment of a cash consideration by recipient shareholders.

However, this argument lacks substance when it is noted that the words "with respect to its stock" do not apply to distributions to a "security holder," under section 355(a) (1) (A) (ii), but only to distributions to a "shareholder" under section 355(a) (1) (A) (i). It is subparagraph (i), and not (ii), which is applicable in this case, since taxpayers receive the stock rights as shareholders "with respect to its stock," and not as security holders "in exchange for its securities."

tion 355(a) (1) (A) (i) transaction under which taxpayers have sought to proceed.

In rejecting the Commissioner's contention that the requirement that sixteen dollars be paid for each share of Northwest stock acquired precluded this transaction from being a distribution "with respect to its stock," the Tax Court made this observation in its opinion:

"If Congress had intended that a distribution of the Northwest stock be treated as tax-free when made without consideration, it is inconceivable that it could have intended the transaction to result in taxable income to the distributees where they *paid out* money in connection with receiving such stock." (Emphasis in original.)

 As taxpayers concede, the fundamental basis of non-recognition of gain or loss under section 355 is that no tax should be imposed when the same people continue to own the same businesses with only formal changes in the business organization.[16] Consistent with that concept section 355(a) (1) (D) provides, in effect, that distributions made pursuant to section 355(a) (1) (A) must be made pursuant to a plan which contemplates a distribution to the shareholders of the distributing corporation of a controlling portion of the stock or securities of the controlled corporation.

 Congress could well conclude that the prospect that the same people (shareholders of the distributing company) will continue to own the same business would be undermined if a distribution was effectuated by means of transferable stock rights, the exercise of which required substantial cash payments. We do not decide whether the transferability of stock rights would, without more, run counter to the overall concept of section 355. But when transferability is coupled with a requirement for a cash payment, it could well be that a substantial number of the distributing corporation's shareholders would, under the circumstances of a particular case, choose to sell their stock rights rather than to themselves make the cash payment which exercise of the stock rights would entail.[17]

Considered in this light, it is not at all inconceivable to us that Congress would be willing to treat a distribution as tax-free when made without consideration, but would be unwilling to so treat a distribution of assignable stock rights which requires a cash payment.

16. See Treasury Regulations on Income Tax (1954 Code) § 1.355–2(c); 3 Mertens, Law of Federal Income Taxation (Zimet and Weiss Revision), § 20.102, page 507.

17. The Tax Court was of the opinion that since more than eighty percent of the shares of Northwest had been finally distributed to Pacific shareholders as of 1963, the control requirement of either (i) or (ii) of section 355(a) (1) (D) had been satisfied. However, we are not here concerned with whether, as events finally unfolded, Pacific shareholders obtained control of Northwest. Section 355 is designed to assure that, unless such retention of control is reasonably certain at the time of initial distribution, non-recognition of gain will not be effectuated. Stated differently, fulfillment of the control requisite is to be adjudged as of the date of the initial distribution rather than by recourse to hindsight in each case after the transaction has been fully consummated.

It is therefore immaterial that, in this case, taxpayers did exercise their stock rights and that, upon completion of the plan in question, more than ninety-five percent of the Northwest stock was owned by the same Pacific shareholders to whom the rights to acquire Northwest stock were distributed. This is particularly true in this case because at the time of the original distribution of fifty-seven percent of the Northwest stock in 1961, it could not be determined whether shareholders of the distributing corporation would receive a controlling amount of the stock in Northwest as required by section 355(a) (1) (D).

It is likewise without controlling significance that section 355(a) (1) (B), quoted in note 6 above, was also perhaps designed in part to retain the business in the same ownership by disallowing this reorganization procedure of section 355 to be used as a device for distributing the earnings and profits of the distributing corporation or the controlled corporation, or both.

We therefore conclude that, as contended by the Commissioner in his first two arguments advanced on this appeal, Pacific did not distribute Northwest stock to taxpayers "with respect to its stock," as required by section 355(a) (1) (A) and, for this reason, section 355 does not excuse taxpayers from recognition of gain realized by them on the transaction in question.

The conclusion just stated makes it necessary to reverse the Tax Court decision. In addition, an independent reason for reversal is disclosed by the Commissioner's argument that Pacific did not distribute control of Northwest in a single distribution, as assertedly required by section 355(a) (1) (D).[18]

■■■ At the outset, we are confronted with the Commissioner's admission that this argument is advanced for the first time in this court. While the Tax Court was not given an opportunity to voice an opinion as to this contention, since it involves a question of law relative to facts which are not in dispute, we may and do, in the exercise of our discretion, consider this additional argument.[19]

■■■ As noted above, Pacific distributed stock purchase rights in September, 1961, and in that year distributed only fifty-seven percent of the Northwest stock which it held. Not until almost two years later, in June, 1963, did Pacific dispose of the remaining forty-three percent of Northwest stock by making another stock purchase right offering. On the basis of these facts, the Commissioner argues that as of 1961, the tax year here in question, Pacific had failed to offer at least eighty percent of the Northwest stock, thereby violating the divestiture of control requirement of section 355(a) (1) (D).[20]

In support of his single distribution theory, and as an indication that section 355, by necessary implication, requires that the date of distribution of a controlling interest in the controlled corporation be a readily identifiable date at the time of the initial distribution, the Commissioner calls attention to the following: (1) both section 355(a) (1) (A) and section 355(a) (1) (D) require that the distributing corporation be in "control" of the controlled corporation "immediately before" the distribution; (2) section 355(b) (1) (A) requires that "immediately after distribution" both the distributing and the controlled corporation must be engaged in an active business; and (3) section 355(b) (2) (B) requires that the controlled corporation business must have been conducted for a period of five years, ending on the "date of distribution." See note 6 above, for the full text of these subsections.

In answer, taxpayers in effect contend that section 355 does not require a single "distribution," but only a single "transaction," and that the two transfers of Northwest stock should be viewed as parts of a single transaction because both offerings were "contemplated and required by the plan of reorganization," which was conceived early in 1961. We

---

18. This is the third of the Commissioner's four principal arguments, as listed earlier in this opinion.

19. In their brief in this court, taxpayers note that this argument is made for the first time on review by this court. They do not contend, however, that this circumstance precludes consideration of the argument here, and they have fully responded to the argument on the merits. The considerations for determining whether this court should allow issues to be raised which were not brought before the Tax Court are set forth in MacRae v. Commissioner, 9 Cir., 294 F.2d 56, 59, in which a new argument, advanced for the first time in this court was considered and found to be meritorious.

20. As is apparent from a reading of section 355(a) (1) (D), quoted in note 6 above, as part of the distribution, the distributing corporation must distribute (i) all of the stock in the controlled corporation, or (ii) an amount of stock constituting "control" within the meaning of section 368(c), 26 U.S.C. § 368(c) (1964). "Control," as defined in section 368(c), is the ownership of at least eighty percent of the total combined voting stock in a corporation and at least eighty percent of all other classes of stock of a corporation.

have examined the exhibits submitted in the Tax Court, however, and find no requirement or general agreement that the remaining stock in Northwest would be distributed in 1963. To the contrary, the plan as explained in the "Proxy Statement" to Pacific shareholders for the 1961 offering of Northwest stock, makes it clear that the remaining shares of Northwest (forty-three percent) would be offered at a "time or times related to its (Pacific's) need for new capital." [21]

Although a "tentative schedule" set forth in Pacific's presentation of its plan does indicate that a second offering of Northwest stock might take place in December, 1962, and a final offering in December, 1963, it is obvious that such a schedule was not binding on Pacific because the only other actual offering of Northwest stock took place in June, 1963. The indefiniteness of the plan to distribute the remaining shares of Northwest is further evidenced by a recital in the Pacific plan for reorganization, to the effect that the number of shares to be offered to Pacific shareholders in any one offering, the number of offerings to be made, and the price at which these shares would be offered would be determined by the board of directors of Pacific "in its sole discretion."

In support of their contention that a single distribution is not required under section 355, taxpayers cite several cases interpreting section 351(a), a corporate organization provision which provides in part:

> "No gain or loss shall be recognized if property is transferred to a corporation * * * by one or more persons solely in exchange for stock or securities in such corporation and *immediately after* the exchange such person or persons are in control * * * of the corporation." (Emphasis supplied.)

In Halliburton v. Commissioner of Internal Revenue, 9 Cir., 78 F.2d 265, summarized by this court in Commissioner of Internal Revenue v. Schumacher Wall Board Corporation, 9 Cir., 93 F.2d 79, 82, we held that although it took twenty-two days and two separate distributions of stock to issue the entire authorized stock of a new corporation, the pre-existing contract which provided for such an arrangement made it necessary to view the entire proceeding as a "single transaction."

Likewise, in Portland Oil Co. v. Commissioner of Internal Revenue, 1 Cir., 109 F.2d 479, the First Circuit noted that the transfers there involved need not be effected simultaneously, "where executed in pursuance of *an antecedent arrangement.*" (Emphasis supplied.) 109 F.2d at 488. The court pointed out, however, that such an arrangement need not be legally binding if made pursuant to a pre-existing agreement between the parties beneficially interested.

For this latter proposition, the court relied upon our decision in Von's Investment Co., Ltd. v. Commissioner of Internal Revenue, 9 Cir., 92 F.2d 861, in which we held that two transfers by different persons may constitute a single transaction even though the transfers were separated by a five-week interval. It is critical to note, however, that this court rested its decision upon a further finding to be thereafter made by the Tax Board as to whether both transfers were made in furtherance of, and for the purpose of executing and putting into effect, the plan of reorganization embodied in an earlier contract between the interested parties.

We do not find the factual situations presented by the cases just discussed to be analogous to the circumstances of the case now before this court. In the instant case the contract between Pacific and Northwest gave no definite date upon the which the remaining shares of Northwest would be distributed, and as of 1961, the time of the original distribution of Northwest stock, it was impos-

---

21. The agreement entered into between Pacific and Northwest incorporated the "Proxy Statement" referred to above.

sible to determine whether the final distribution would take place in two, three or even ten years, depending upon Pacific's need for additional capital.

Additional practical problems in the administration of section 355 would be presented if section 355 were held applicable in these circumstances. Since control could only be established after eighty percent of the Northwest stock had been distributed to Pacific shareholders, it would be impossible for the taxpayers or the Commissioner to evaluate the applicability of the particular provisions of section 355, listed above, until the time when, by subsequent distribution, the eighty percent requirement should be met. Until then, which in this case was 1963, but might just as well have been years later, taxpayers had no way of knowing whether, in computing their taxes for 1961, the benefits of section 355 were available. Likewise until then, the Commissioner would be held at bay in determining the accuracy of taxpayers' 1961 tax return. Such an interpretation would run counter to the purpose of section 355.[22]

Taxpayers further assert that other reorganization provisions have always permitted various steps in consummating plans of reorganization as part of a single transaction. Although certain reorganizations may necessitate various steps before a reorganization may be effected, no such circumstance is presented here. It did not require the nearly two-year period which transpired in the instant case to distribute the percentage of Northwest stock required to fit within the provisions of section 355. The only apparent reason for this delay was Pacific's lack of need for additional capital at the time of the original distribution of Northwest stock.[23]

■ Under these circumstances, we think that a fair interpretation of section 355 requires that there be a single transaction in which a controlling interest is transferred and that for two or more distributions to be entitled to treatment as a single transaction transferring control of the controlled corporation to the shareholders of the distributing corporation, such distributions must not extend over any greater period of time than is reasonably necessary considering the practical problems involved in completing such distributions, apart from other considerations such as Pacific here had in mind in extending the distributions over a period of nearly two years. Applying this test, we hold that the control requirement of section 355 has not been met in this case.

In view of our conclusions reached above regarding the inapplicability of section 355 for each of the three reasons discussed, we need not consider the fourth reason advanced by the Commissioner.

In the Tax Court, taxpayers asserted several alternative arguments for the non-taxability of the distribution in question. The Tax Court did not consider and decide those alternative arguments. Since we are now rejecting the application of section 355 under the cir-

22. A practical problem is also posed by section 355(b) (1) and (2), which requires that the distributing corporation must have been conducted for a period of five years ending on "the date of the distribution." Since "control," as defined in section 368(c), did not pass out of Pacific's hands until the 1963 distribution of Northwest stock, this could be considered the "date of distribution." Such an interpretation, however, would allow the distributing corporation to circumvent this 355 subsection by extending the date at which final distribution of control would be completed.

23. In its presentation of the plan in question, Pacific stated that its reasons for selling about fifty-six percent of the Northwest stock, rather than more or less were as follows: (1) to allow the parent corporation, American, to acquire more than fifty percent control of Northwest and thereby relieve Pacific of the responsibility of such control, and (2) the sale of this percentage of Northwest stock would enable Pacific to obtain the cash needed to pay off its advances from American without having excess cash left over which would have to be temporarily invested at a low return.

cumstances of this case, we remand the case to the Tax Court for consideration of taxpayers' alternative arguments.

Reversed and remanded for further proceedings consistent with this opinion.