Gerald R. REDDING and Dorothy M. Redding and Thomas W. Moses and Anne M. Moses, Petitioners–Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.

Nos. 79–1775, 79–1776.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1980.

Decided Aug. 25, 1980.

---

Daniel F. Ross, Tax Div., Dept. of Justice, Washington, D.C., for respondent–appellant.

Robert N. Davies, Indianapolis, Ind., for petitioners–appellees.

Before BAUER, WOOD and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

This is an appeal by the Commissioner of Internal Revenue from determinations of the United States Tax Court that Gerald R. and Dorothy M. Redding and Thomas W. and Anne M. Moses ("taxpayers") do not owe any income tax on account of the receipt or exercise of stock warrants.[1] These warrants were distributed as part of a series of transactions involving distribution by the Indianapolis Water Company (the "Water Company") to its stockholders of all the stock of its wholly–owned subsidiary, Shorewood Corporation ("Shorewood"). The distribution of warrants was made preliminarily to the distribution of stock, which was distributed upon the exercise of the warrants. The Tax Court treated the two distributions as being part of a single transaction, sheltered from taxation under section 355 of the Internal Revenue Code of 1954,[2] granting nonrecognition to a corporation's distribution to its stockholders of stock or securities in a controlled corporation. We hold that the distribution of stock warrants to the taxpayers constituted a dividend to them and that section 355 is not available to render the transaction nontaxable. We, therefore, reverse.

## I.

The Water Company, which is a public utility, owned all of the stock of Shorewood, which in turn owned most of the waterfront property surrounding the reservoirs used by the Water Company. Shorewood wished to develop its waterfront realty, but the Indiana Public Service Commission determined that real estate development was not an appropriate activity for a public utility and suggested that Shorewood be separated from the Water Company.

---

1. The terms "stock rights" (or "rights") will be used in this opinion interchangeably with the term "warrants" since both terms have been used interchangeably in this litigation. In financial circles, "warrants" usually refer to *longer -term* options to purchase stock at a stated price (a "subscription price" or "exercise price" or "option price") than do stock rights. In the instant litigation some of the parties and the Tax Court have also referred frequently to stock rights evidenced by warrants. *See* Whiteside, *Income Tax Consequences of Distribution of Stock Rights to Shareholders*, 66 Yale L.J. 1016, 1016–17 n. 1 (1957); J. Weston & E. Brigham, *Managerial Finance*, 1018, 1020 (6th ed. 1978).

2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

To achieve this end, Shorewood's capital structure was altered. In 1970, Shorewood's authorized common stock was increased from 1,000 and 2,500,000 shares. On the same day, Shorewood issued to the Water Company 481,291 shares of common stock in exchange for Shorewood's 1,000 shares then outstanding and held by the Water Company. On January 6, 1971, the Water Company agreed to purchase an additional 855,630 shares of common stock from Shorewood for a total ownership of 1,336,921 shares. The board of directors of the Water Company decided to distribute to its shareholders of record on January 6, 1971, stock rights or warrants to purchase Shorewood stock on the basis of one warrant for each share of the Water Company common stock outstanding. The warrants gave the holder the right to receive one share of Shorewood stock upon surrender of two warrants and the payment of $5.00 to the Water Company and further right to subscribe to any remaining Shorewood shares by allotment. The warrants were transferable.

The total offering of Shorewood shares by the Water Company thus amounted to 1,069,537 shares, which comprised slightly more than 80% of the total outstanding amount of Shorewood stock. Of these shares to be offered, 50,000 shares were reserved for the underwriters, and 1,019,537 shares were available for distribution to warrant holders. Any shares not sold to warrant holders were to be bought by the underwriters, on a "firm commitment" basis, at a slightly discounted price. The Water Company thus retained slightly less than 20% of the outstanding Shorewood stock. Immediately after the distribution, the shareholders of the Water Company held substantially more than 50% of the outstanding shares of Shorewood.

The warrants were issued on January 7, 1971, and expired and became valueless if not exercised by 3:30 p. m. on January 22, 1971. During this subscription period, shareholders or their transferees or assignees subscribed to all 1,069,537 Shorewood shares offered, except for 50,000 shares acquired by the underwriters. Hence, 1,019,537 shares of Shorewood stock were actually distributed to the warrant holders and 50,000 shares conveyed to the underwriters on February 2, 1971. As contemplated by the Water Company, an over–the–counter market in warrants developed during the subscription period, with the price ranging from $0.39 to $1.05 per warrant. There is no dispute that both at the time of issuance and at the time of exercise of the warrants the subscription price of $5.00 was less than the fair market value of Shorewood stock. That is to say that at all relevant times there was a "spread" between the subscription price and the fair market value of Shorewood stock.

Taxpayers were stockholders of the Water Company. Gerald and Dorothy Redding owned 7,000 Water Company shares, and Thomas and Anne Moses owned 35,543 shares. They received a corresponding number of warrants and exercised all of them. The Moseses also exercised an additional subscription privilege to obtain an additional 6,228 shares of Shorewood stock.

Taxpayers contended that both the receipt and the exercise of the warrants were tax–free to them under the provisions of section 355.[3] It was stipulated that the

---

**3.** Section 355 provides:
  (a) Effect on distributees
  (1) General rule. If
    (A) a corporation (referred to in this section as the "distributing corporation")
     (i) distributes to a shareholder, with respect to its stock, or
     (ii) distributes to a security holder, in exchange for its securities,
  solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

    (B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

transaction was not a "device" for the distribution of earnings and profits pursuant to section 355(a)(1)(B);[4] that the separately conducted "active business" requirements of section 355(a)(1)(C) were met; that the 1,069,537 shares of Shorewood distributed in the offering amounted to 80% control; and that the shares retained by the Water Company were not held for tax avoidance purposes within the meaning of section 355(a)(1)(D)(ii).

## II.

The Tax Court[5] agreed with taxpayers that the transactions involved in these cases met the requirements for a corporate division, in this case a "spin–off," contained in section 355 and were, accordingly, tax–free. A spin–off occurs when the stock of a subsidiary corporation is distributed to the shareholders of the parent without the surrender by them of stock in the parent.[6] "[T]he general purpose of Congress in sanctioning, in proper cases, tax–free spin–offs was to permit the real owners of enterprises to rearrange their units and evidences of ownership to suit their own ideas of how best to carry on their businesses." *Commissioner v. Wilson*, 353 F.2d 184, 186 (9th Cir.1965). *See* H.Rep.No. 1337, 83d Cong.,

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and
(D) as part of the distribution, the distributing corporation distributes–
(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or
(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,
then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

(b) Requirements as to active business.– . . . I.R.C. § 355.

4. At the time of distribution the Water Company had accumulated earnings and profits in excess of $8 million. This was adequate to cover the distribution.

2d Sess., *reprinted in* [1954] U.S.Code Cong. & Admin.News pp. 4017, 4059. *Accord* S.Rep.No. 1622, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 4621, 4672.

In reversing the Tax Court, we find taxpayers have failed to meet their burden of showing that the several transactions here meet the tests of section 355 so as to qualify for nonrecognition of the gain otherwise subject to tax. As the parties and the Tax Court acknowledged to be the case were we to find section 355 inapplicable, we conclude the distribution of the warrants by the Water Company is taxable as a dividend. It is not controlling that taxpayers sold none of their rights, exercised all of them, and received stock for them (for which taxpayers also paid the additional consideration of $5.00 per Shorewood share). The tax treatment of taxpayers must depend upon an analysis of the transaction as a whole rather than only of the specific facts applicable to these taxpayers. This is true because the nonrecognition of gain afforded by section 355 requires adherence to requirements governing the transaction as a whole.[7]

5. The Tax Court opinion is reported at 71 T.C. 597 (1979).

6. Section 355 also shelters "split-offs" and "split-ups." "A split-off involves the same kind of transaction as a spin off except that the shareholders surrender part of their stock in the parent corporation in exchange for stock in the subsidiary. In a 'split up,' the parent corporation transfers substantially all of its assets to two or more corporations and then liquidates, its stockholders surrendering all their stock in the transferor and receiving the stock of the transferee corporations." *Commissioner v. Baan*, 382 F.2d 485, 491 n.9 (9th Cir. 1967), *aff'd sub nom. Commissioner v. Gordon*, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968). *See* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 13.01 at 13–3—13–4 (4th ed. 1979).

7. As the Supreme Court stated in *Commissioner v. Gordon*, 391 U.S. 83, 91–94, 88 S.Ct. 1517, 1521–1523, 20 L.Ed.2d 448 (1968),

Section 355 provides that certain distributions of corporations controlled by the distributing corporation do not result in recog-

The Tax Court, in determining whether the issuance of the warrants and their exercise by warrant holders should be immunized from tax by section 355, purported to rely heavily on its prior ruling granting tax–free status to warrants used in somewhat similar transaction in *Baan v. Commissioner*, 45 T.C. 71 (1965),[8] *rev'd*, 382 F.2d 485 (9th Cir. 1967), *aff'd sub nom. Commissioner v. Gordon*, 382 F.2d 499 (2d Cir.1967), 9th Cir. *aff'd sub nom. Commissioner v. Gordon*, 2d Cir. *rev'd*, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968).[9] In *Baan*, the Tax Court apparently felt that it could ignore the issuance of warrants as a taxable event under the dictum of *Palmer v. Commissioner*, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50 (1937), that an issuance of stock rights is not a dividend,[10] and that it could proceed to consideration of the warrant *exercise* and stock issuance only.[11] In the instant case, on the other hand, the Tax Court expressly declined to state a view on the current vitality of the *Palmer* dictum.[12] Instead, it applied the "step transaction doctrine" to reach its conclusion that the two transactions which took place should be viewed as "steps" in a single transaction meeting the requirements of section 355 and that, hence, neither the receipt nor the exercise of the warrants results in tax. We shall, therefore, address first the applicability of the step transaction doctrine, which we think is significantly related to the current status of the *Palmer* dictum, to be discussed later. As to the application of the step transaction doctrine, we believe the Tax Court erred.

nized gain or loss to the distributee shareholders. *The requirements of the section are detailed and specific, and must be applied with precision.* . . . Congress has abundant power to provide that *a corporation wishing to spin off a subsidiary must, however bona fide its intentions, conform the details of a distribution to a particular set of rules* (footnote omitted) (emphasis supplied). This comment is merely a restatement of legislative intent regarding the care with which section 355 is to be administered:

Your committee has carefully considered the application of the so -called court made rules such as the "business purpose" doctrine. . . . It is your committee's intention, . . that *literal compliance with all the provisions upon which the statute conditions nonrecognition of gain or loss shall be sufficient to achieve the results there set forth.* H.Rep.No. 1337, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 4017, 4253–4254 (emphasis supplied).

8. "[Absent] some indication of the need for self correction, the policy of stare decisis operates in petitioners' favor. *Helvering v. Hallock*, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604 (1940)." 71 T.C. at 608.

9. As is obvious from the citation of subsequent history, the *Baan* litigation spawned several opinions illuminating various facets of the instant problem. The Court of Appeals for the Ninth Circuit reversed the finding of non -taxability and the Supreme Court affirmed that judgment on grounds not addressed by the Tax Court, which are not essentially germane here.

In addition, commentary both before and after *Baan* · has dealt extensively with a number of the issues presented here. *See, e. g.*, Carl-son, *Taxation of "Taxable" Stock Rights: The Strange Persistence of Palmer v. Commissioner*, 23 Tax L.Rev. 129 (1968); Gann, *Taxation of Stock Rights and Other Options: Another Look at the Persistence of Palmer v. Commissioner*, 1979 Duke L.J. 911 (1979); Whiteside, *supra* note 1, 66 Yale L.J. 1016 (1957); Comment, *Taxation of Stock Rights*, 51 Calif.L.Rev. 146 (1963); Note, *Taxing Corporate Distributions of Stock and Property Warrants*, 51 Col.L. Rev. 496 (1951); Note, *Income Taxation–Reorganization Exercise of Rights Received in Spin off Held Nontaxable Sale of Rights Taxable as Dividend*, 35 U.Cinn.L.Rev. 254 (1966); Note, *Corporate Tax: Spin offs under Section ·355; Commissioner v. Baan and Commissioner v. Gordon*, 54 Va.L.Rev. 295 (1968).

10. "The mere issue of rights to subscribe and their receipt by stockholder, is not a dividend." *Palmer v. Commissioner*, 302 U.S. at 71, 58 S.Ct. at 70. *See, infra*, at 1181.

11. In *Baan*, the Commissioner had claimed that the taxpayers had received ordinary income measured by the difference between the fair market value of the distributed stock and its subscription price.

12. "For if the rights distribution was but a step to be ignored in a section 355 transaction, we need not decide whether the rights distribution standing alone would be a taxable event or whether the *Palmer* doctrine has viability under the 1954 Code. . . . Because we resolve this case in petitioners' favor on the section 355 issue without reliance upon the stock rights issue in *Palmer*, we do not reach the question of the *Palmer* doctrine's current vitality." 71 T.C. at 602- 03 & n.4.

## III.

■ The attempted application of the step transaction doctrine in this case to shift the focus from the issuance of the stock rights or warrants to the subsequent distribution of stock is important, because, to qualify under section 355, a distribution must consist solely of stock or securities, which do not include stock rights such as these. *See* Treas.Reg. § 1.355–1(a) (1979). *See also* S.Rep.No. 1622, 83d Cong., 2d Sess. 266, *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 4621, 4902. As the Court of Appeals for the Ninth Circuit said in *Commissioner v. Baan,*

> [Section 355(a)(1)(A)] relates "solely" to the distribution of "stock or securities" of the controlled corporation. Further, in view of section 355(a)(1)(D)(ii), which incorporates the "control" definition of section 368(c), the "stock or securities" distributed must carry voting rights. Stock rights are not stocks or securities and, most assuredly, are not stock or securities carrying voting rights. They are only options to purchase stock. 382 F.2d at 492 (footnote omitted).

*See Gordon v. Commissioner,* 424 F.2d 378, 381–83 (2d Cir.1970) construing the similar language of section 354(a)(1).

The Tax Court does not disagree with this conclusion but seeks to keep the related transactions within the ambit of section 355 by integrating through the step transaction doctrine the distribution of stock warrants and the subsequent exercise of these warrants. By that technique the overall transaction can be viewed as a distribution solely of stock, which is allegedly immunized from tax by section 355.

The commentators have attempted to synthesize from judicial decisions several tests to determine whether the step transaction doctrine is applicable to a particular set of circumstances in order to combine a series of steps into one transaction for tax purposes. Unfortunately, these tests are notably abstruse—even for such an abstruse field as tax law. And we must bear in mind, in applying the "tests" that "[t]he step transaction doctrine is only a judicial device expressing the familiar principle that in applying the income tax laws, the substance rather than the form of the transaction is controlling." Note, *supra* note 9, 51 Calif.L.Rev. at 157 (footnote omitted).

In any event, one of the tests which the parties ask us to consider is the "end result" test, whereby purportedly separate transactions will be amalgamated into a single transaction when it appears that "the successive steps were made 'in furtherance of, and for the purpose of executing and putting into effect, the plan of reorganization.' " Mintz & Paul, *supra* note 13, at 250. *See also Kuper v. Commissioner,* 533 F.2d 152, 155–56 (5th Cir. 1976), and cases cited therein. Here, the distribution of stock warrants was not made for the purpose of reaching the end result of distributing stock to the Water Company shareholders. Indeed, the workings of the stock warrant mechanism indicate that it was a matter of relative indifference to the Water Company, from the standpoint of raising capital for Shorewood or for itself, whether the Shorewood stock went to Water Company shareholders, or to their assignees of warrants (or to the underwriters). Had the paramount purpose of the Water Company been to distribute its portfolio Shorewood stock in a way that Water Company shareholders would in the end become Shorewood shareholders, the obvious way to proceed would have been simply to omit the first "step" and to distribute Shorewood stock directly to Water Company shareholders. But such an approach would have made it difficult to raise new capital, which was a paramount and somewhat inconsistent goal.

We find unexpected support for our conclusion in the Tax Court's finding that,

> The issuance of the rights by Water Co. shareholders was merely a *procedural device* to give Water Co. shareholders the opportunity to be *included* or *excluded* from the Shorewood stock distribution by their own decision. These rights existed only for a short period of time and only for this very limited purpose. Thus, their distribution was merely a brief transitory phase of a *corporate separation.* 71 T.C. 610–11 (emphasis supplied).

# 1176

The transferable quality of the warrants demonstrates that they were not intended primarily to facilitate the *inclusion* of Water Company shareholders in the Shorewood stock distribution. No transferable warrants would have been required to *include* these Water Company shareholders. In fact, if the sole purpose of the transactions were to give Water Company stockholders a direct interest in Shorewood (the ostensible purpose of a corporate division), transferable warrants would not have been necessary. Instead, a direct stock distribution would have sufficed. Here where the Water Company's purpose went far beyond a simple corporate division, the use of transferable warrants made it possible to bring in *new* distributees for the Shorewood stock (together with new capital for Shorewood and for Water Company). Therefore, the reason for using transferable warrants was to arrange in advance for Water Company shareholders to be excluded as recipients of Shorewood stock in favor of new investors prepared to make a capital contribution.[13] Hence, to the extent that the rights distribution was a step, it was not a necessary step in the sort of corporate division contemplated by section 355.[14] Our conclusion is directly buttressed by the stipulation of the parties that "[t]he use of rights that

required payment of a subscription price as a method of distribution of the Shorewood common stock was dictated by the need of Shorewood for capital to develop its assets and business." Stipulation of Facts at ¶ 22, Brief for Appellees, Supplemental Appendix A.

■ The reference of the Tax Court to the warrant issue as a "merely procedural device" is misleading.[15] Insofar as the warrants had a readily ascertainable market value, they had independent economic significance, and, as indicated, their function in the series of transactions was to make it possible for Water Company shareholders to defer profitably to others who were prepared to make an investment in Shorewood. Further, since the warrant distribution had independent economic significance, that distribution was a matter of substance rising above mere form or procedure.

■ Taxpayers also contend that it was not essential to use warrants as evidence of "legal rights" to receive stock and that this fact is significant. They describe several alternative procedures not involving the issuance of warrants which would have provided the same "legal benefits or opportunities" as those provided by warrants.[16] As a

---

13. The exclusion of Water Company investors was, of course, at their own option and was made attractive to them by their opportunity to sell the warrants at a profit to other investors willing to provide capital. Whether the payment by the warrant holders for stock is called the "sales price" of the stock or a "capital contribution" is not crucial to our analysis. *Compare Commissioner v. Baan*, 382 F.2d at 492, *with Commissioner v. Gordon*, 382 F.2d at 504 05, 505 06. *See* Note, *supra* note 9, 54 Va.L.Rev. at 307 10.

14. "[The] purpose [of section 355] and the purpose of its predecessors is to give to stockholders in a corporation controlled by them the privilege of separating or 'spinning off' from their corporation a part of its assets and activities and lodging the separated part in another corporation which is controlled by the same stockholders. Since, after the spin-off, the real owners of the assets are the same persons who owned them before, Congress has been willing that these owners should be allowed, without penalty, to have their real ownership divided into smaller . . . entities than the single original corporation, if the real owners decide

that such a division would be desirable." *Commissioner v. Wilson*, 353 F.2d at 186.

15. The use of warrants (options) might be a "merely procedural device" *if* the subscription price was the same as fair market value, and there was no "spread." These conditions do not pertain here. *See* Gann, *supra* note 9, at 962.

16. As one hypothetical procedure, they suggest the board of directors could have simply resolved on January 7, 1971, that on February 2, 1971, the Water Company would distribute to its shareholders of record on January 6, 1971, one share of newly issued Shorewood stock for each two shares of Water Company stock. Under these circumstances, following taxpayers' argument, the shareholders of the Water Company on January 6, 1971, would have had the legal right to receive the Shorewood stock on February 2, 1971. These shareholders could then have sold the stock which they had a legal right to receive on a "when-issued" basis to new purchasers. On February 2, the existing stockholders would receive the distributed

result, they say the fact that the legal rights to receive stock were "evidenced by a piece of paper" did not break "the connection between the distribution of rights to acquire Shorewood stock and the actual distribution of the Shorewood stock." In conclusion, they argue:

> [T]he mere fact that the rights of the Taxpayers and other shareholders were evidenced by transferable warrants did not provide them with any legal benefits or opportunities they would not have had in a *more typical section 355 spin–off.* Brief for Appellees at 21 (emphasis supplied).

But simply because some other means (which arguably comply with section 355) might have been used to reach ultimate results similar to those sought in this case does not suggest that the procedures followed here are entitled to section 355 treatment.

First, " '[t]he Commissioner is justified in determining the tax effects of transactions on the basis in which taxpayers have molded them.' *Television Industries, Inc. v. C.I.R.,* 284 F.2d 322, 325 (2d Cir. 1960)." *Commissioner v. Gordon,* 382 F.2d at 514 (Friendly, J., dissenting). Second, taxpayers do not explain precisely how the suggested alternative means would raise capital (a paramount objective). Third, Congress narrowly constrained the means for gaining the tax benefit; the issue here is whether the means of using transferable warrants comply with the "detailed and specific requirements of section 355." *Commissioner v. Gordon,* 391 U.S. at 92, 88 S.Ct. at 1522. Fourth, the fact that the rights were "evidenced by a piece of paper" gave

them a marketable identity and helped endow them and their receipt with independent economic significance.[17]

The second "test" for determining whether the step transaction doctrine applies is the so–called "interdependence test," which requires an evaluation "whether on a reasonable interpretation of objective facts the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." Paul & Zimet, *Step Transactions,* in Paul, Selected Studies in Federal Taxation (2d series 1938) 200, 254. *See also King Enterprises, Inc. v. United States,* 418 F.2d 511, 516, 189 Ct.Cl. 466 (1969), and cases cited therein; 3 Mertens, Law of Federal Income Taxation (Rev. 1972), § 20.161. Although there is some question whether the "interdependence test" is even relevant to the corporate division situation,[18] were we to apply the test to the facts before us we would not find use of the warrants sufficiently indispensable to achieving a spin–off to compel us to view this as a unitary transaction. *See ACF–Brill Motors Company,* 14 T.C. 263 (1950), *aff'd,* 189 F.2d 704 (3d Cir. 1951). While the exercise of the warrants here was obviously dependent upon warrants having been issued, the issuance of warrants did not require their exercise by shareholders in the purchase of stock from the Water Company. The Water Company would have divested itself of Shorewood stock and raised money *without* exercise of the warrants by shareholders. Insofar as the issuance of warrants contemplated the raising of capital through the disposition of stock, the result would

---

shares but would be legally obligated to re-transfer those shares to the new purchasers. Alternatively, taxpayers could have sold their Water Company shares before February 2, on an ex-dividend basis, meaning the taxpayer would have retained the right to receive Shorewood stock but would have sold his Water Company stock to a new purchaser. Any Water Company shareholder who sold his stock ex dividend would not have been a Water Company shareholder on the date he received Shorewood stock.

The record does not disclose the practicability of these procedures, particularly if the need

to raise $5.00 per Shorewood share is introduced into the problem.

17. "[T]he rights themselves are valuable items of property freely traded on the market." Gann, *supra* note 9, at 974.

18. *See King Enterprises, Inc. v. United States,* 418 F.2d at 518 n.8, 189 Ct.Cl. at 472 n.8, *quoting* a discussion to that effect in the context of certain types of reorganizations in Mintz and Plumb, *Step Transactions in Corporate Reorganizations,* 12 N.Y.U.Inst. on Fed. Tax. 247, 285 (1954).

have been essentially the same whether the warrants were exercised by Water Company shareholders or by non–shareholder assignees. Even if the warrants were not exercised at all, the underwriters had agreed to purchase the stock (albeit at a slightly reduced price). Although the use of warrants made it more likely than a public offering that Water Company shareholders would end up as Shorewood shareholders, the money would have come in and the stock gone out with or without the exercise of the warrants. On the other hand, the transferable warrants led away from, rather than toward, a goal of spinning off to *shareholders*, which could have occurred by direct stock distribution without warrants. Considering the Water Company's diverse purposes, there is little evidence that it acted in concert with its shareholders who exercised warrants to achieve a joint objective.

Finally, the Commissioner argues that the transactions before us also fail to satisfy a third test permitting invocation of the step transaction doctrine, the "binding commitment" test. As explained by the Supreme Court in *Commissioner v. Gordon*, 391 U.S. at 96, 88 S.Ct. at 1525, the step transaction doctrine should not apply unless "if one transaction is to be characterized as a 'first step' there must be a binding commitment to take the later steps." The Commissioner, noting that the Tax Court in the instant case found that there was no binding commitment for a stock distribution to follow the rights issuance,[19] stresses that the absence of such commitment renders the step transaction doctrine inapplicable. Although this is a valid contribution to the analysis, we do not find the point determinative.

The Supreme Court articulated the binding commitment test in the factual context of a multi–step distribution similar to that before us. Given this similarity, we would embrace and apply the "binding commitment" test were it not for one important difference between the *Gordon* case and that before us. The multi–step distribution

in *Gordon* took place in successive tax years, a time–span obviously exceeding the several weeks involved in the instant case. This lengthy time period raised the possibility that the transactions' tax impact would remain indefinite and indeterminable for an unlimited period, an eventuality inconsistent with the premise of annual tax accounting and one the Court may have thought necessitated the "binding commitment" test. We cannot say that the Court intended that the failure to satisfy the test in the circumstance of a much shorter period would automatically preclude application of the step transaction doctrine. Hence, the lack of "binding commitment" is simply one factor to which we give appropriate consideration here. Certainly, it is not necessary for us to rely on this factor to reach our result.

Our examination of the facts in light of the various tests convinces us that the issuance of transferable warrants not only had independent economic significance but added nothing to the essential process of effecting a spin–off, "to permit the real owners of enterprises to arrange their units and evidences of ownership to suit their own ideas of how best to carry on their business." *Commissioner v. Wilson*, 353 F.2d at 186. It may be, as the Tax Court emphasizes, that the warrants were in existence for only a short period of time but their economic value is clear, and they were actively traded during the period of their existence. Fundamentally, we think it inappropriate to substitute the step transaction doctrine as a tax shield for the warrant issuance if the dictum of *Palmer v. Commissioner* is no longer available to immunize the warrant transaction. *See, infra*, at 1181–1182.

### IV.

Even were we to agree that the step transaction doctrine permits these transactions to be viewed as simply a distribution of Shorewood stock, the requirement of section 355(a)(1)(A) that this stock be distrib-

---

**19.** *See* 71 T.C. at 610.

uted *with respect to* the stock of the Water Company has not been met. What has instead happened has been that the stock warrants have been distributed with respect to the stock of the Water Company, and the Shorewood stock has then been distributed with respect to the warrants (as well as to the underwriters). It was the warrant distribution rather than the stock distribution which conformed to this statutory test.

After the distribution of warrants to Water Company stockholders had taken place, the subsequent distribution of shares of Shorewood stock was made "with respect to" the holders of warrants—some Water Company shareholders and some not—and to the underwriters. This was not, in the words of the Supreme Court, "conform[ing] the details of a distribution to a particular set of rules." *Commissioner v. Gordon*, 391 U.S. at 94, 88 S.Ct. at 1523.[20] As Judge Sterrett said in dissent in the Tax Court,

> How can it be claimed that the exchange, between Water Co. and a nonshareholder third party, of Shorewood shares in return for $5 and two warrants, was "actually" a distribution to a distributing corporation shareholder with respect to his stock? 71 T.C. at 616.

It has been argued that the status of the Water Company shareholders was important because their existence created any purchaser's right to receive the stock "through" the stockholders of the Water Company, as the Tax Court suggested in the comparable situation of *Baan v. Commissioner*, 45 T.C. 71. But, in comparison with the more straightforward view that section 355 contemplates simply distributions to shareholders, this analysis is painfully strained. The Tax Court was apparently not unduly troubled by the problem of distributions to non–stockholders or the fact that the use of transferable warrants structured the transaction in the direction of transfers to third parties. The Tax Court was apparently satisfied by the fact

that the shareholders of the Water Company actually received more than 50% of the Shorewood stock, a sufficient percentage to satisfy the so–called continuity–of–shareholder–interest test.

■ The continuity–of–shareholder–interest test is "a doctrine of judicial origin based on what is conceived to be the unstated but fundamental statutory purpose of providing for nonrecognition of gain or loss only if the reorganization exchange is distinguishable from a sale...." B. Bittker and J. Eustice, *supra* note 6, ¶ 3.05 at 3–19. Generally, if one–half or more of the stock remains in the hands of the original shareholders, such continuity of interest is adequate proof that a sale was not effected. Here, the Tax Court found it harmless from the standpoint of fulfilling the "with respect to its stock" requirement of section 355(a)(1)(A) that Shorewood stock was sold to third parties so long as 50% or more of it ended up with Water Company shareholders. The Tax Court apparently reasoned (although this is not explicit in its opinion) that, when section 355 applied to a rights offering, it was enough, for purposes of section 355(a)(1)(A) that at least 50% of the stock or securities of the subsidiary come to rest in the hands of shareholders of the parent.[21]

■ This way of thinking conflicts with that of the Court of Appeals for the Ninth Circuit which stated in *Commissioner v. Baan*, "Congress could well conclude that the prospect that the same people (shareholders of the distributing company) will continue to own the same business would be undermined if a distribution was effectuated by means of transferable stock rights, the exercise of which required substantial cash payments." 382 F.2d at 495. We cannot agree with the Tax Court, if we understand its reasoning, that the failure of the distribution of Shorewood stock to be "with respect to" Water Company stock was

---

**20.** On precisely this point, Judge Friendly said, "Certainly the words [of the statute] have an uneasy fit to the transaction . . . in question." *Commissioner v. Gordon*, 382 F.2d at 513 (Friendly, J., dissenting).

**21.** The comments of the Tax Court on these points are somewhat cryptic. For our interpretation of them, *see* Gann, *supra* note 9, at 977.

harmless merely because 50% or more of Shorewood stock came to rest with Water Company shareholders. We know of no authority that mere satisfaction of the 50% standard is enough to meet the section 355(a)(1)(A) problem.[22]

## V.

We reach only in passing the further issue upon which Judge Sterrett relied in his dissenting opinion below that the Water Company did not distribute 80% of the Shorewood stock within the meaning of section 355(a)(1)(D), and therefore that the transaction was not tax–free under section 355. The Tax Court found that this issue was foreclosed by the stipulations entered into by the parties for purposes of this litigation.

■ Section 355(a)(1)(D) requires that stock constituting "control" of the controlled corporation, defined under section 368(c) as at least 80%, must be distributed. We think the "distribution" referred to in section 355(a)(1)(D) is the same "distribution" as that referred to in section 355(a)(1)(A) requiring a "distribution" to shareholders of the issuing corporation with respect to its stock. In other words the statute "requires distribution of control to *shareholders of the distributing corpora-*

tion." *Redding v. Commissioner*, 71 T.C. at 617 (Sterrett, J., dissenting).

Here, after the transaction at issue, the Water Company retained 267,384 shares or exactly 20%, less one share, of the total 1,336,921 shares of Shorewood stock issued and outstanding. The Water Company thus must have distributed slightly more than 80%. But of the shares constituting this 80%, 50,000 were acquired by the underwriters. As Judge Sterrett found, the transfer of the 50,000 shares to the underwriters reduced the percentage of the stock "distributed" to Water Company shareholders to, at most, 76.26% of all Shorewood shares issued.[23] Were it not for the stipulation, we would probably be persuaded by the Commissioner on this point, and the issue would necessarily be significant in our decision.

## VI.

■ Given our conclusion that the step transaction doctrine does not require this transaction to be seen simply as a distribution of Shorewood stock and our further finding that even if it could be so viewed, there has been a failure to comply with the requirements of section 355, we must turn finally to a determination of what constitutes the taxable event.

**22.** In addition, because of the requirements of section 355(a)(1)(B), set out in full at note 3 *supra*, the 50% standard is presumably applicable where there has been no prearrangement of stock transfers to third parties after the distribution. In the instant circumstances, a distribution of stock *based on a prior distribution of rights*, where some of the rights are sold before the stock is distributed, is a situation where "stock . . . [is] sold . . . pursuant to an arrangement . . . agreed upon prior to . . . [the] distribution [of the stock]." I.R.C. § 355(a)(1)(B). Any such transfer by prearrangement to non–stockholders might render the transaction at least presumptively nonconforming under section 355. *See Gann, supra* note 9, at 975 n.161, 964 n.145; B. Bittker and J. Eustice, *supra* note 6 at ' 14.11. We are, of course, aware of the stipulation here with respect to section 355(a)(1)(B), but, in divining the intent of Congress, we think all the subsections of section 355 must be read together to arrive at the meaning, for example, of section 355(a)(1)(A).

**23.** We do not know to what level this figure was further reduced by the exercise of warrants by individuals who received or purchased them from Water Company shareholders.

We find somewhat persuasive the reasoning applied by Judge Sterrett in concluding his analysis of the section 355(a)(1)(D) issue:

In order to sustain the Court's decision herein one would have not only to ignore the substance and importance of the rights issuance, but also assume that all [the recipients of] the rights traded over the counter and all the underwriters were also Water Co. shareholders. I cannot join in this assumption and it seems, in any event, to be contrary to the . . . [statutory] language. The petitioner has not shown to whom Water Co. transferred "control" inasmuch as no one related group of distributees had 80 percent of Shorewood's stock immediately after the transfer. It is not this Court's function to assume petitioners' prima facie case. Rather, such case must be proven. 71 T.C. at 617 (Sterrett, J., dissenting).

The Commissioner contends that the taxable event is the receipt of the warrants; taxpayers contend that, if the transaction is taxable at all, the taxable event would be the exercise of the warrants. There is also a difference of view as to how to measure the income received with respect to the warrants. In our view these matters are rather simply dealt with under the Internal Revenue Code of 1954.

The method of taxing corporate distributions was extensively revised in the 1954 Code. A distribution to shareholders, as such, of rights to acquire stock of the distributing corporation is, with exceptions not germane here, excluded from gross income under section 305. Rights distributed to shareholders to acquire the stock of another corporation, however, are *not* specifically excluded from gross income by the 1954 Code.

Section 301(a) of the Code states that, except as otherwise provided in chapter 1 of the Code, a distribution of property, as defined in section 317(a), made by a corporation to a shareholder with respect to its stock, will be treated as provided in section 301(c). Section 301(c) provides that where section 301(a) applies to a distribution, that amount of the distribution that is a dividend, as defined in section 316, will be included in gross income.

■ Under section 316(a), any distribution of "property" by a corporation to its shareholders out of its earnings and profits accumulated after February 28, 1913 is a "dividend." "Property" as defined in section 317(a) "means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or right to acquire such stock)." The specific *exclusion* of rights to acquire stock of the distributing company implies that rights to acquire stock of another corporation are *included* in the term "property." Indeed, the legislative history of the 1954 Code leaves no doubt that this broad definition of property includes stock warrants:

As a result of [the exclusion in] this definition, the receipt of stock, of a corpo-

ration which is not stock of the distributing corporation (or is not treated as such stock under . . . section 353 [later renumbered as section 355] . . .) would be treated as property for the purpose of section 301 (and other relevant provisions of this subsection). H.Rep. No. 1337, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Admin.News pp. 4017, 4238.

*See also Baumer v. United States,* 580 F.2d 863, 881 (5th Cir. 1978); Rev.Rul. 70–521, 1970–2 C.B. 72; Carlson, *supra,* 23 Tax.L. Rev. at 141.

■ Thus, since the distribution of warrants here was not sheltered from taxation by section 355, taxpayers received a dividend upon receipt of the warrants and the amount of the dividends was the fair market value of the warrants received. *See* Rev.Rul. 70–521, 1970–2 C.B. 72.

### VII.

■■ It is argued, of course, that such a result contradicts the dictum of *Palmer v. Commissioner.* In that opinion Mr. Justice Stone said:

The mere issue of rights to subscribe and their receipt by stockholders, is not a dividend. No distribution of corporate assets or diminution of the net worth of the corporation results in any practical sense. Even though the rights have a market or exchange value, they are not dividends within the statutory definition. . . . [citations omitted] They are at most options or continuing offers, potential sources of income to the stockholders through sale or the exercise of their rights. Taxable income might result from their sale, but distribution of the corporate property could take place only on their exercise. 302 U.S. at 71, 58 S.Ct. at 70.

But this analysis in the *Palmer* dictum was made under the Revenue Act of 1928, which did not contain the broad definition of "property" added in 1954 as section 317(a)

of the Code.[24] Obviously, the Internal Revenue Code of 1954 must govern our decision. Although the superseding legislation and the congressional commentary it generated did not specifically discuss the *Palmer* dictum, several provisions of the 1954 Code governing corporate distributions seem incompatible with the principle that income never results from the mere issuance of stock rights. Whether, in enacting these provisions, Congress intended to "overrule" *Palmer* with respect to its famous dictum is left for us to intuit. We believe, though, that a "reasonable interpretation" of the corporate distribution provisions as a whole yields the conclusion that, even if the dictum was authoritative prior to 1954, it must now make way for a result consonant with the 1954 Code (and, incidentally, more reflective of economic reality).[25]

In addition to the definition of "property" in section 317(a), which we find includes stock rights in the shares of a non–issuing corporation, the 1954 Code added a provision in section 305 which indicates another change in the law of tax–free receipt of stock rights. The general rule of section 305(a) excludes from taxability stock rights to acquire stock in the issuing corporation. However, one exception to this rule in section 305(b) is designed to tax distributions when they are effectively granted "in lieu of money." If the exception applies, the distribution of stock or of stock rights "shall be treated as a distribution of property to which section 301 applies." This ex-ception precludes any inference that Congress intended to perpetuate the *Palmer* dictum. Thus, both sections 305(b) and 317(a) vitiate the "no property" rationale of the *Palmer* dictum. *See* Whiteside, *supra* note 1, at 1029–30; Comment, *supra* note 9, 51 Calif.L.Rev. at 150–51.

Indeed, the Supreme Court itself has apparently done the next thing to explicitly rejecting the *Palmer* dictum in light of the 1954 Code. In *Commissioner v. Gordon*, the Court discussed the relevant provisions of the Code and said that when a corporation sells its property to its stockholders or their assignees at less than fair market value, the transaction diminishes the net worth of the corporation and is a "distribution of property" within section 316. In attempting to relate this statement to discussion of the same subject in *Palmer*, the Court made broader observations:

> In *Palmer*, rights were distributed entitling shareholders to purchase from the corporation shares of stock in another corporation. Finding that the sales price represented the reasonable value of the shares at the time the corporation committed itself to sell them, the Court found no dividend. It held that the mere issue of rights was not a dividend. *It has not, however, been authoritatively settled whether an issue of rights to purchase at less than fair market value itself constitutes a dividend, or the dividend occurs on the actual purchase.* 391 U.S. at 90 n. 4, 88 S.Ct. at 1521 (emphasis supplied).

24. As has been noted, "[T]he 1928 revenue statute, . . . defined a dividend as 'any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings and profits.' The *Palmer* Court concluded that the issuance of an option did not constitute a distribution out of corporate profits, and so was not a dividend." Gann, *supra* note 9, at 940.

25. Our conclusion is supported by the presumption employed in statutory interpretation that "legislative language will be interpreted on the assumption that the legislature was aware of . . . judicial decisions that [hold] if a change occurs in the legislative language a change was intended in legislative result, . . . ." C. Sands, 2A Sutherland Statutory Construction, § 45.12 at 37 (4th ed. 1973).

In fact, the drafters of the 1954 Code demonstrated their awareness of this presumption when they stated with specific reference to amendments affecting corporate distributions and adjustments,

[Y]our committee's bill is considerably more detailed than the existing code. As a result of the complexity of the transactions involved, statutory brevity is to a large extent incompatible with clarity in this area. However, *by codifying numerous judicial and administrative decisions and by replacing many others by clear statutory provisions* your committee's bill represents a real simplification of existing law. H.Rep. No. 1337, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Admin.News pp. 4017, 4059 (emphasis supplied).

■ This statement in *Gordon*, which as we have noted was quite similar on its facts to the instant case, withdraws any compulsion which may previously have arisen from the dictum in *Palmer* to prohibit treating the receipt of stock rights as the receipt of a dividend. In the instant case, the Tax Court pointedly refused to assess the *Palmer* doctrine's current vitality. 71 T.C. at 603 n. 4. Further, in *Baumer v. United States*, the Court of Appeals for the Fifth Circuit, confronted with a problem similar to ours, carefully limited the *holding* in *Palmer* to its precise facts. 580 F.2d at 878–81.[26] We think the better interpretation under the provisions of the 1954 Code and the regulations construing them is that, in the case of stock rights, where the subscription price is lower than fair market value, there is a dividend at the time of issuance (and receipt) of the rights measured by the fair market value of the rights at the time of issuance.

This conclusion is buttressed by repeated commentary since enactment of the 1954 Code. The commentators have not restricted their attacks on the continued vitality of the *Palmer* dictum to discussions of the incompatibility of the 1954 amendments and *Palmer*'s no–property rationale:

> Not only is the statutory language [of the 1954 Code] inconsistent with the view that the nature of stock rights prevents the shareholder from receiving a taxable interest upon issuance, it also seems to repudiate the judicial requirements [expressed in *Palmer*] of corporate intention to make a distribution. The statute now provides a simpler and more objective test—has the corporation in fact made a distribution of property to the shareholders under section 301? "Distribution" not

expressly defined, is used in context to describe an actual transfer of property by the corporation to the shareholders, and, as already seen, stock rights in shares of . . . another corporation are embraced within the statutory pattern. Whiteside, *supra* note 1, at 1030–31.

Furthermore,

> [T]he *Palmer* theory seems inconsistent with current views about the nature of options to buy stock and of the nature of dividends. To say that rights are "merely" an offer for a sale does not really go to the heart of the question. A transferable right to buy stock ordinarily has real economic value—even if the price is at or above current value. This is proved simply by the fact that such rights can be sold. The receipt of stock rights that can be sold for value is well within the limits to which the concept of income has now been pushed. . . .
>
> To say that a distribution of rights to buy portfolio shares cannot be a dividend because it results in no diminution of corporate assets is in any event not a complete legal argument. In the first place, a corporation that has granted an option on its property has in a real economic sense parted with a valuable asset—the right to dispose of that property to others and thus to realize any spread between its market value and the option price—not to mention the sacrifice of its interest in any future increment in value while the option is outstanding. But more to the point, there is no rule that a dividend must diminish corporate assets, although that is usually its effect. *Carlson, supra* note 9, at 152–53.

We believe that we are required under the provisions of the 1954 Code to move

---

**26.** "[T]he Fifth Circuit in *Baumer* limited the application of *Palmer* to a situation in which no spread exists on the date of issuance and the option period is so short that it is contemplated that the property subject to the option will be immediately sold to the shareholder before any substantial appreciation in the value of the underlying property can occur. Under the *Baumer* opinion, the issuance of the option is the distribution of a valuable asset to be taxed as a dividend if a spread exists on the date the option is issued, or if no spread exists on the date of issuance, but the option period is long enough so that the corporation contemplates appreciation. This analysis looks at the economic effect of the transaction to determine the existence of a dividend, and it correctly encompasses the two factors that attribute value to options—that is, both the existence of a spread on the date of issuance, and the length of the option period and potential appreciation during that period." *Gann, supra* note 9, at 956–57.

beyond the dictum of *Palmer* and its pre–1954 progeny such as *Choate v. Commissioner*, 129 F.2d 684 (2d Cir. 1942).[27] A fair reading of the decision of the Supreme Court in *Commissioner v. Gordon* requires that *Palmer* be limited to its facts, namely, a situation where there was no spread between option (subscription) price and market value on the date the corporation adopted its plan of distribution. When a substantial spread between market and option price prevails at all relevant times, we perceive no requirement to follow rigidly the *Palmer* dictum. Since options (warrants) are "property" as defined in the 1954 Code, they fall easily within the scope of the statutory scheme for the taxation of dividends. Such an approach better reflects economic reality since an option incorporating a spread is a thing of value capable of being actively traded in public markets. Further, from an administrative point of view the valuation approach dictated by the Code and regulations seems simpler than that developed in valuation cases purportedly based on *Palmer*, such as *Choate, Gibson v. Commissioner*, 133 F.2d 308 (2d Cir.), *cert. denied*, 320 U.S. 805, 64 S.Ct. 23, 88 L.Ed. 486 (1943), and *W. G. Maguire & Co. v. Commissioner*, 20 T.C. 20 (1953).[28] Hence, based on careful analysis of relevant authority and a perception of the economic realities, we believe that the step we take here is fully justified. The time has come to put *Palmer* in perspective, and we do so with full confidence that our conclusion meets the most exacting standards of deference to the precedents of the Supreme Court, which in all respects control the decisions of the inferior federal courts. *See Hendricks County Electric Membership Corp. v. N. L. R. B.*, 627 F.2d 766, No. 80–1283 (7th Cir. July 21, 1980).

Reversed and Remanded for further proceedings consistent with this opinion.

BAUER, Circuit Judge, dissenting.

I dissent. I would adopt the opinion of the Tax Court and affirm its judgment.

---

27. *Choate* established that whether or not a distribution of stock rights is taxable as a dividend is to be determined by an objective assessment of whether the corporation intended to make a distribution of earnings. That intent hinges on the existence of a spread between the option price and the fair market value of the property on the date of issuance of the rights.

If such an intent is found to exist, the rights will be taxed at exercise upon the lesser of either the spread on the date of issuance or on the date of exercise.

28. For a discussion of the complications which give rise to problems of administrative complexity, *see* Gann, *supra* note 9, at 937–38.