In re the MARRIAGE OF Sara
Catherine PIERCE and
Robert O. Pierce, Jr.

Sara Catherine Pierce, Appellant,

v.

Robert O. Pierce, Jr., Respondent.

No. 23053.

Missouri Court of Appeals,
Southern District,
Division One.

May 2, 2000.

Motion for Rehearing and Transfer to
Supreme Court Denied May 24, 2000.

King E. Sidwell, Blanton, Rice, Sidwell & Nickell, L.L.C., Sikeston, for Appellant.

John L. Oliver, Jr., Oliver, Oliver & Waltz, P.C., Cape Girardeau, for Respondent.

CROW, Presiding Judge.

Sara Catherine Pierce ("Cathy")[1] appeals from a judgment dissolving her marriage to Robert O. Pierce, Jr. ("Bobby").[2]

The first of Cathy's two claims of error avers the trial court mistakenly found Bobby's interest in two partnerships to be his separate property instead of marital prop-

erty. The second assignment of error maintains the trial court wrongly valued one of the partnerships "at no value" and the other "at a negative value."

Because Cathy registers no protest about any of the other rulings in the massive judgment,[3] this opinion sets forth only the evidence pertinent to her two complaints.

Bobby is a son of Robert O. Pierce ("R. O.").[4]

R. O. testified he incorporated R.O. Pierce Farms, Inc.[5] "about 1974." That entity is henceforth referred to as "Pierce Inc." R. O. avowed that since then he had given "shares of stock" in Pierce Inc. to his children.[6]

Cathy and Bobby married July 10, 1976.

At trial,[7] the parties stipulated Bobby owns "a 25 percent interest" in Pierce Inc. Cathy conceded in the trial court—and acknowledges in this court—that Bobby's interest in Pierce Inc. is his separate property.

R. O. recounted he formed a partnership, Pierce Farms Partnership, in 1988. That entity is henceforth referred to as "Farms Partnership."

Explaining at trial why he formed Farms Partnership, R. O. said:

"To really gain more entities because of the government's program. A corporation is limited to one entity, and partnerships are as many as you've got partners. So to qualify for government payments that exceed the limitations for

---

1. Sara Catherine Pierce is referred to in the transcript and the judgment appealed from as "Cathy." For brevity and clarity, this opinion adopts that designation.

2. Robert O. Pierce, Jr. is referred to in the transcript and the judgment as "Bobby." For brevity and clarity, this opinion adopts that designation.

3. The comprehensive judgment comprises 22 pages. In addition, a "Parenting Plan" incorporated by reference in the judgment occupies another four pages.

4. For brevity and clarity, Robert O. Pierce is referred to by the initials of his forenames.

5. In R. O.'s testimony, this entity is referred to as "R. O. Pierce, Inc." However, this court deduces from tax documents in evidence that the correct name of this entity is: R. O. Pierce Farms, Inc.

6. This court gleans from the transcript that R. O. has another son, Jeff, and a daughter, Carol Olson.

7. Trial occurred February 18, 1999.

one ... we formed a partnership to ... give us more entities [and to] qualify for more government payment."

R. O.'s testimony about the relationship between himself, Pierce Inc. and Farms Partnership included this:

"Q. ... Farms Partnership farms the land owned by you and your wife and the corporation?[8]

A. Plus all of the rented land.

Q. Okay. And the 5,000 acres you refer to, is that your land?

A. No. No. That's the total land that we farm. And three-fourths of it is rented land."

Because Farms Partnership was created to engage in farming, it needed farming equipment as soon as it was formed. R. O. described how Farms Partnership acquired the needed equipment:

"We ... started it ... by letting the farms have all of the equipment that was owned by [Pierce Inc.] and giving a five-year lease on that equipment with a balloon at the end of five years."

This court gathers from that testimony[9] that the "lease" referred to by R. O. was a lease-purchase agreement whereby Farms Partnership agreed to pay installments to Pierce Inc. for five years, followed by a larger payment at the end of that period. Upon making all of the payments, Farms Partnership was to become owner of the equipment.

This court further divines from the evidence that Farms Partnership's earnings enabled it to make the required payments,

thereby acquiring ownership of the equipment. That supposition is borne out by a "Balance Sheet" signed by R. O. on December 31, 1997, showing Farms Partnership's assets included equipment valued at $1,031,300.

R. O. avowed Farms Partnership owns no land; its sole activity is farming.

At trial, the parties stipulated Bobby owns "a 25 percent interest" in Farms Partnership.

The judgment contains a finding that Farms Partnership "was started by gift" when Pierce Inc. leased its equipment to Farms Partnership. The trial court further found Farms Partnership "started with no capital whatsoever." Based on those findings and others, the trial court ruled Bobby's interest in Farms Partnership was his "non-marital property."

Bobby's interest in Farms Partnership is one of the two assets which, according to Cathy, the trial court mistakenly classified as Bobby's separate property instead of marital property.

The other partnership in issue is Pierce Fish Farms.[10] That entity is henceforth referred to as "Fish Partnership."

Bobby's brief asserts—without citation to the record—that Fish Partnership "has been in operation since April 1994." The record contains tax documents for Fish Partnership for the calendar years 1993 through 1997. Cathy's brief declares Fish Partnership was "formed after marriage."

Because both parties agree Fish Partnership was formed during their marriage,

8. Inferably, Pierce Inc. Many questions and answers at trial were imprecise or incomplete. As a result, this court, striving to grasp the import of what the lawyers and witnesses were attempting to establish, was compelled to assiduously study some passages of testimony in the context of what preceded and followed them. In other instances, the thrust of a witness's testimony could be apprehended only by reading it in conjunction with testimony of another witness elsewhere in the record. The briefs were scant help, as their statements of fact were in many instances cast in generalities instead of specifics. Because

of this frustrating problem, this court, instead of attempting to summarize some of the pertinent testimony, has quoted it, thereby providing the reader firsthand with scraps of the evidence on which this opinion is based.

9. That testimony is an example of the problem identified in footnote 8, *supra*.

10. This court's assumption that this entity's name is Pierce Fish Farms is based on tax documents in evidence.

it is unnecessary for this court to explore the prodigious record [11] in an attempt to discover when Fish Partnership came into being.

Describing the origin of Fish Partnership, R. O. recounted Laura Pierce [12] owned 160 acres "on Interstate 155." R. O. continued: "[W]e decided to develop it into catfish ponds.... We were still in the corporation when we built the ponds.... They built ... all the ponds, built the levees, built the roads." Then, this:

"Q. And it—The—The fish farm, did—did Bobby or any of the other partners contribute any cash, take anything—

A. No.

Q. —out of their—

A. There was no—

Q. —earnings or income?

A. —no—no personal funds, no distributions to the fish farm.

Q. All—All the labor, et cetera, came—equipment, all came from the corporation; is that a—

A. Correct.

Q. —fair statement?

A. Yes."

The judgment contains a finding that Pierce Inc. "spun off" Fish Partnership. The trial court noted Fish Partnership used individually owned land, rent-free, and used Pierce Inc.'s equipment to dig the ponds. The court further found Fish Partnership "used capital borrowed from [Pierce Inc.] and [Farms Partnership] to purchase fish." Based on those findings and others, the trial court concluded Bobby's interest in Fish Partnership was his "non-marital property."

The record reflects confusion at trial about the extent of Bobby's interest in Fish Partnership.

Cathy's lawyer offered to stipulate Bobby owns "a 20 percent interest in ... Fish ... Partnership."

Bobby's lawyer responded: "If you're writing them down, Judge, it's 25 percent. [Cathy's lawyer] and his expert have not been able to get those figures correct."

As best this court can deduce from the record, Bobby's interest in Fish Partnership is 20 percent, not 25 percent. This court bases that deduction on a "Balance Sheet" bearing Bobby's name dated December 31, 1997. That document shows one of Bobby's assets is a 20 percent interest in Fish Partnership valued at $61,526. This court's belief that Bobby's interest in Fish Partnership is 20 percent is buttressed by a statement in Bobby's brief—unaccompanied by citation to the record—that Bobby's interest is "20% of fish."

Cathy's first point relied on:

"The trial court erred and abused its discretion in finding ... Farms Partnership and ... Fish [Partnership] to be the separate property of [Bobby] because all property acquired subsequent to the marriage and prior to a decree of ... dissolution is presumed to be marital property regardless of whether title is held individually or by the spouses in some form of co-ownership and the party claiming the property to be separate has the burden of proving the property to be his nonmartial property by clear and convincing evidence and the trial court did not apply this standard in that both entities were separate ventures formed after the date of marriage by people who happened to be partners in an existing corporation[[13]] for the pur-

---

**11.** The exhibits alone aggregate hundreds of pages.

**12.** A document in evidence identifies Laura Carol Pierce as a shareholder of Pierce Inc. How—if at all—she is related to R. O. or Bobby is unrevealed.

**13.** This court is unaware of how individuals can be *partners* in a corporation. This court has always understood that people who invest in a corporation are *shareholders*.

pose of maximizing Department of Agricultural [sic] farm subsidy payments which ventures were formed without initial capital investment based upon borrowed funds, and thereafter the business generated sufficient profits to retire the debt."

In their respective briefs, the parties recognize § 452.330, RSMo Cum.Supp. 1998, is pertinent to Cathy's first point. That statute reads, in pertinent part:

"2. For purposes of sections 452.300 to 452.415 only, 'marital property' means all property acquired by either spouse subsequent to the marriage except:

(1) Property acquired by gift, bequest, devise, or descent;

(2) Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise, or descent;

(3) Property acquired by a spouse after a decree of legal separation;

(4) Property excluded by valid written agreement of the parties; and

(5) The increase in value of property acquired prior to the marriage or pursuant to subdivisions (1) to (4) of this subsection, unless marital assets including labor, have contributed to such increases and then only to the extent of such contributions.

3. All property acquired by either spouse subsequent to the marriage and prior to a decree of ... dissolution of marriage is presumed to be marital property regardless of whether title is held individually or by the spouses in some form of co-ownership.... The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection 2 of this section."

Bobby's brief acknowledges it was his burden to demonstrate that his interests in Farms Partnership and Fish Partnership were acquired by one or more of the methods in subdivisions 1 through 4 of subsec-

tion 2 of § 452.330. Bobby insists he met that burden.

In regard to Farms Partnership, Bobby asserts:

"All of the capital to start that partnership, including in particular the equipment, was provided by [Pierce Inc.] to the partnership. All of the assets and capital came from the corporation. None of the operating assets or capital came from any individual partner."

In regard to Fish Partnership, Bobby proclaims:

"[Fish Partnership] was created exactly the same way; i.e., in 1990 on land owned by the corporation and by [Bobby's] parents, and the corporation built ponds, levies [sic], roads, and supplied the equipment to begin Pierce Fish Farms. Again, none of the partners made any cash investment—100% came from the Corporation."

■ Citing *Hoffmann v. Hoffmann*, 676 S.W.2d 817 (Mo. banc 1984), Bobby emphasizes that property is characterized as marital or separate depending on the source of funds used to purchase it. In the instant case, says Bobby, the source of funds used to create his interests in Farms Partnership and Fish Partnership was nonmarital, "i.e., funds or property from [Pierce Inc.] and therefore, the 'non-marital principal' retained its original status."

Cathy responds:

"The equipment and depreciable assets [of Farms Partnership and Fish Partnership] were acquired with borrowed funds. Thereafter, the business generated sufficient profits to retire the debt. Contrary to the assertion of [Bobby] and his counsel, the new entities were not spun-out of [Pierce Inc.], but rather were separate ventures entered into by people who happened to be stockholders in an existing business.... [Pierce Inc.] sold equipment on a lease/purchase arrangement to two ... new ventures."

In support of that argument, Cathy cites the following segment of R. O.'s testimony:

"Q. So when both of these partnerships started, they started with a debt?

A. Well, they didn't start with a debt. They started with buying equipment.

Q. At least an obligation?

A. Well, whatever you call it. But they started off even, but they were—they were going to buy the equipment, and they did have to sign the lease to buy it.

Q. But you didn't require of each of the partners to come in and shell out $100,000 to buy their way into that partnership?

A. No.

Q. Everybody, I guess, got a loan, signed guarantees on a loan and started the farming operation?

A. Yes."

The only inference this court can draw from the above testimony is that the partnerships acquired equipment by buying it from Pierce Inc. under a lease/purchase agreement, and that the partnerships obtained operating capital to commence their businesses by borrowing from lenders (perhaps including Pierce Inc.) with the partners guaranteeing the loans.

The notion that Pierce Inc. "spun off" Farms Partnership and Fish Partnership apparently convinced Bobby that his interests in those partnerships were not marital property.

■ Bobby misunderstands spin-off.

"A spin-off occurs where a part of the assets of a corporation is transferred to a new corporation and the stock of the transferee is distributed to the shareholders of the transferor without the surrender by them of stock in the transferor."

*Commissioner of Internal Revenue v. Baan,* 382 F.2d 485, 491 (9th Cir.1967).

■ Obviously, no spin-off occurred when R. O. created Farms Partnership and Fish Partnership.

First, neither Farms Partnership nor Fish Partnership is a corporation.

Second, as neither Farms Partnership nor Fish Partnership is a corporation, Pierce Inc. and its shareholders received no shares of stock in Farms Partnership or Fish Partnership.

Third, the shareholders of Pierce Inc. (who became partners in Farms Partnership and Fish Partnership) did not receive their interests in those partnerships because they were shareholders of Pierce Inc. The partners received their interests by obligating themselves to buy equipment from Pierce Inc. and guaranteeing loans by which the new partnerships obtained capital to commence their businesses.

The payments received by Pierce Inc. from the partnerships obviously became the property of Pierce Inc. If Pierce Inc. profited from its dealings with the partnerships, the value of Bobby's separate, nonmarital interest in Pierce Inc. may have been enhanced. Any enhancement, of course, would be nonmarital. § 452.330.2(5).[14]

However, Bobby's interests in the partnerships were clearly acquired during the marriage and were not acquired by any of the methods in § 452.330.2. Consequently, Bobby's interests in the partnerships cannot escape classification as marital property.

Based on the evidence—such as it is[15]—this court holds the trial court erred in

---

14. Although any growth in value of Bobby's interest in Pierce Inc. would be nonmarital, this court recognizes that any dividends Bobby received as a shareholder of Pierce Inc. during the marriage were marital property. *In re Marriage of Perkel,* 963 S.W.2d 445, 450[3] (Mo.App. S.D.1998).

15. The amorphous quality of the evidence is detrimental to Bobby. That is because his interests in the partnerships were acquired during the marriage, hence they are presumed to be marital property. *Smith v. Smith,* 985 S.W.2d 836, 845[15] (Mo.App. W.D.1998). It was Bobby's burden to prove otherwise. *Id.* Inasmuch as the murky proof

ruling that Bobby's interests in Farms Partnership and Fish Partnership were his separate property instead of marital property.

■ The next issue is whether that mistake entitles Cathy to a reversal of some part of the judgment.[16]

■ Error without prejudice is no ground for reversal. *Neavill v. Klemp,* 427 S.W.2d 446, 448[9] (Mo.1968). An error in classifying property in a dissolution proceeding is not prejudicial unless it materially affects the merits of the action. *In re Marriage of Perkel,* 963 S.W.2d 445, 452[12] (Mo.App. S.D.1998); *In re Marriage of Jennings,* 910 S.W.2d 760, 765[7] (Mo.App. S.D.1995). The appellant has the burden to establish prejudice. *Morris v. Duker,* 414 S.W.2d 77, 79–80[3] (Mo. 1967). As shall appear *infra,* Cathy has failed to meet that burden.

The trial court found Bobby's interest in Farms Partnership "has no value." The court further found Bobby's interest in Fish Partnership "has a negative value" of $26,819.

Cathy's second point:

"The trial court erred and abused its discretion in valuing Pierce Fish Farms, a partnership, at no value and Pierce Farms Partnership at a negative value of twenty six thousand eight hundred nineteen dollars (-$26,819.00) because, in adopting the proposed findings submitted by [Bobby], there was no substantial evidence to support it or it was against the weight of the evidence in that neither the testimony of Doug McDowell nor any other witness proffered by [Bobby] purported to establish a current fair market value for the business entities but rather merely stated the ac-

counting balance for capital accounts based upon net book value without consideration of the fair market value of the assets while the only evidence of fair market value before the trial court for the business entities in question was set forth in the valuations admitted to by [Bobby] in the financial statements filed in support of loan applications given to financial institutions."

This court's first observation regarding Cathy's second point is that it inverts the trial court's findings.

As recounted earlier, the trial court found Bobby's interest in Farms Partnership "has no value." Cathy's second point avers the trial court valued "Pierce Farms Partnership" at a negative value of $26,-819.

The trial court further found Bobby's interest in Fish Partnership "has a negative value" of $26,819. Cathy's second point avers the trial court valued "Pierce Fish Farms, a partnership, at no value."

Despite Cathy's confusion, this court has seined the argument following her second point in search of merit.

The first evidence referred to in the second point is "the testimony of Doug McDowell." McDowell, a certified public accountant, was presented as "an adverse witness" by Cathy.

Cathy's brief quotes segments of McDowell's testimony appearing at pages 156 and 173–75 of the transcript. Cathy's purpose in directing this court to that testimony, as best this court can discern from her brief, is to demonstrate that McDowell did not put a value on Bobby's interests in Farms Partnership and Fish Partnership, but testified only about Bobby's "capital account" [17] in those entities.

was unequal to that task, Bobby bears the consequences.

16. Cathy's brief prays this court to reverse the judgment. Because Cathy complains only about the trial court's rulings regarding Bobby's interests in Farms Partnership and Fish Partnership, this court doubts Cathy wants

this court to reverse the judgment in toto, as that would nullify the dissolution of the marriage and the provisions for custody and support of the parties' children.

17. A partner's "capital account" is described thus in II Bromberg and Ribstein, Partnership § 6.02(a): "[A]n 'account' that is 'credit-

An "Exhibit W" referred to in McDowell's testimony showed Bobby's capital account in Farms Partnership as "(112,-428.00)." Inasmuch as the digits are surrounded by parentheses, this court infers Bobby's distributions from Farms Partnership, together with his share of its losses, exceeded his contributions and share of profits by $112,428.

The trial court found:

"Bobby has a negative equity account of [$112,428 in Farms Partnership]. In a liquidation or sale, he would have to 'repay'. Therefore, the interest has no value."

According to Cathy, the only evidence before the trial court as to the value of Farms Partnership was the "Balance Sheet" signed by R. O. on December 31, 1997, referred to earlier in this opinion. That document showed assets of $2,005,860 and liabilities of $794,784, leaving a net worth of $1,211,076.

Bobby responds that Farms Partnership's financial posture changed between December 31, 1997, and trial.[18] There was testimony by R. O. that the assets shown on the December 31, 1997, Balance Sheet included "approximately $630,000" of "carryover crop"; that the "carryover crop" had been sold, as had the 1998 crop; that Farms Partnership had no crop "in current assets"; that the equipment valued at $1,031,300 on the December 31, 1997, Balance Sheet had declined in value, being worth about $750,000 at time of trial. R. O. lamented, "This is the worst year that we've ever had[.]"

Furthermore, avowed R. O., the combined debt of Farms Partnership and Fish Partnership was $964,400. If this court correctly understands that testimony, about $767,600 of that debt is attributable to Farms Partnership. Asked whether Production Credit Association would loan Farms Partnership sufficient funds to "plant a crop in 1999," R. O. replied that because of the existing debt, he and his wife would have to "mortgage our land" to obtain the $1,000,000 needed to "make a 5,000–acre crop."

The thrust of R. O.'s testimony, as this court fathoms it, is that instead of a net worth of $1,211,076 (the figure on the December 31, 1997, "Balance Sheet"), Farms Partnership's net worth at time of trial was approximately $327,000, ostensibly making Bobby's 25 percent interest worth about $81,750.

However, because Exhibit W showed Bobby's capital account in Farms Partnership as a negative $112,428, it is obvious that R. O.'s testimony, if believed, supported a finding that Bobby's interest in Farms Partnership, at best, had no value.[19]

The trial court evidently believed R. O. The trial court found that the decline in Farms Partnership's net worth, coupled with the negative balance in Bobby's capital account (a minus $112,428 according to the trial court), established that Bobby's 25 percent interest in Farms Partnership was worth nothing.

 Cathy asserts the trial court should not have believed the value of Farms Partnership shrunk so rapidly between December 31, 1997, and trial. How-

ed with' partner contributions and shares of profits and 'charged with' distributions and partner shares of losses."

18. Footnote 7, *supra*.

19. Exhibit W displays a handwritten notation "1998" and a handwritten figure "(89779)" for Bobby's capital account in Farms Partnership. If that value—inferably a minus $89,-779—is used instead of the earlier figure on Exhibit W—a minus $112,428—it is manifest

that the net value of Bobby's interest in Farms Partnership, based on R. O.'s testimony, is still a negative amount. That is because the trial court found that Bobby, in a liquidation or sale of Farms Partnership, would be charged with the negative balance in his capital account. Cathy does not attack that finding. Because the negative balance in Bobby's capital account exceeds the value of his 25 percent interest in Farms Partnership, he would receive nothing.

ever, in this judge-tried case, credibility of the witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe none, part, or all of any witness's testimony. *Herbert v. Harl*, 757 S.W.2d 585, 587[1] (Mo. banc 1988). This court does not substitute its judgment for that of the trial court on credibility issues. *Dukes v. Dukes*, 859 S.W.2d 264, 268[4] (Mo.App. S.D.1993); *Estate of Graves*, 684 S.W.2d 925, 928[2] (Mo.App. S.D.1985).

The other evidence referred to in Cathy's second point is "the valuations admitted to by [Bobby] in the financial statements filed in support of loan applications given to financial institutions."

From the argument following the point, we deduce Cathy is referring to a written statement Bobby signed December 31, 1997, showing his 25 percent interest in Farms Partnership was worth $302,769. Our assumption was confirmed by Cathy's lawyer during oral argument.

However, the $302,769 value was evidently based on the premise that the net worth of Farms Partnership on December 31, 1997, was $1,211,076, the amount shown on the Balance Sheet signed by R. O. that date.[20] As reported earlier, R. O.'s testimony, which the trial court apparently found persuasive, showed the net worth of Farms Partnership declined dramatically between December 31, 1997, and the date of trial.

Another document referred to in the argument following Cathy's second point is a financial statement Bobby submitted to Security Bank of Pemiscot County dated August 6, 1998. This court divines that document is Exhibit 23, a notion confirmed by Cathy's lawyer during oral argument.

An examination of Exhibit 23 reveals Bobby valued his 25 percent interest in Farms Partnership at "40627–" which apparently means a negative $40,627. That assumption is confirmed by the values of the other assets listed on the document

and the total thereof. The total is correct only if the value of Farms Partnership is a negative $40,627.

If this court has correctly interpreted the evidence identified in the four preceding paragraphs, such evidence does not support Cathy's hypothesis that the trial court erred in assigning no value to Bobby's interest in Farms Partnership.

This court's understanding of Cathy's brief is that she relies on the same documents regarding the value of Bobby's interest in Fish Partnership as she relied on regarding the value of his interest in Farms Partnership. This court finds those documents do not demonstrate the trial court erred in assigning a negative value to Bobby's interest in Fish Partnership. This court shall not lengthen this opinion by discussing that evidence, as such an exercise would have no precedential value.

Because Cathy has failed to demonstrate the trial court erred in finding Bobby's interest in Farms Partnership had no value and his interest in Fish Partnership had a negative value, Cathy has failed to establish prejudice in the trial court's erroneous classification of those interests as Bobby's nonmarital property instead of marital property. Consequently, the error is no ground for reversal. *Neavill*, 427 S.W.2d at 448[9].

Judgment affirmed.

PARRISH and SHRUM, JJ., concur.

**20.** Twenty-five percent of $1,211,076 is $302,-769.